**BIRTH CONTROL CENTERS, INC., East Gyn Center, Inc., Northland Family Planning Clinic, Inc., Northland Family Planning Clinic West, Inc., Leon A. Hockman, M.D., Richard Goldfine, M.D., Julio B. Acosta, M.D., Enrique B. Gerby, M.D., Youl Choi, M.D., Plaintiffs,**

**v.**

**Maurice S. REIZEN, M.D., Director, Michigan Department of Public Health, Defendant.**

**Civ. A. No. 80–70508.**

United States District Court, E. D. Michigan, S. D.

March 2, 1981.

Bette Huster, Detroit, Mich., for plaintiffs.

Walter Kron, Asst. Atty. Gen., Public Health Division, Lansing, Mich., for defendant.

## OPINION

FEIKENS, Chief Judge.

This is a civil action for declaratory and injunctive relief under 42 U.S.C. § 1983 challenging the constitutionality of certain provisions of the Michigan Public Health Code, Public Act 368 of 1978, M.C.L. §§ 333.1101 *et seq.* (M.S.A. §§ 14.15(1101) *et seq.*) ("the Act"), and the regulations promulgated thereunder, Michigan Administrative Code ("M.A.C.") R. 325.3801 *et seq.*, which provide for the licensing and regulation of "freestanding surgical outpatient facilities" ("FSOFs").[1] An FSOF is defined in the statute as

> a facility, other than the office of a physician, dentist, podiatrist, or other private practice office, offering a surgical procedure and related care that in the opinion of the attending physician can be safely performed without requiring overnight inpatient hospital care. It does not include a surgical outpatient facility owned by and operated as part of a hospital. M.C.L. § 333.20104(5) (M.S.A. § 14.15(20104(5)).

Plaintiffs in this case are four clinics in which first-trimester abortions are performed, and five physicians who perform abortions in those clinics. All of these plaintiffs have standing to assert not only their own rights, but also to sue on behalf of pregnant women who intend to terminate their pregnancies and whose rights may be affected by the regulatory scheme at issue.[2] *Mahoning Women's Center v. Hunter,* 610 F.2d 456 (6th Cir. 1979); *Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health, et al.,* 426 F.Supp. 471, 473 (E.D.Mich.1977). The defendant is Maurice Reizen, Director of the Michigan Department of Public Health ("MDPH" or "the Department"), the agency authorized to promulgate and enforce regulations implementing the Act.

The events precipitating this suit were the notifications sent on January 23, 1980 by the Department to the plaintiff clinics asking them to immediately apply for licenses under Public Act 368. Failure to apply for a license as required by statute can result in criminal prosecution.[3] The plaintiffs subsequently filed a motion for preliminary injunction, which was heard on

---

1. Public Act 368 supersedes Public Act 274 of 1974, M.C.L. §§ 331.471 *et seq.* (M.S.A. §§ 14.1179(71) *et seq.*). The regulations promulgated under the prior Act were reenacted without any alterations when Public Act 368 took effect in 1978 (representations of counsel, 6/5/80, Tr. at 291). The predecessor statute, Public Act 274, and the regulations now before me in this case, were challenged by different plaintiffs in *Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health, et al.,* 426 F.Supp. 471 (E.D.Mich.1977). In that case, Judge Cornelia Kennedy held, on a motion for summary judgment, that two provisions of the regulatory scheme were unconstitutional as applied to freestanding surgical outpatient facilities performing only first-trimester abortions: § 21 of Public Act 274 (M.C.L. § 331.491 (M.S.A. § 14.1179(91)), which banned all advertising by a licensed freestanding surgical outpatient facility, and Rule 28 of the regulations (M.A.C. R. 325.3828), which required the consent of a parent or guardian prior to surgical procedures for unemancipated minor patients. Judge Kennedy found that the statute and regulations in all other respects passed constitutional muster. Although § 21 was deleted in the new statute, Public Act 368, the objectionable portion of Rule 28 has not yet been physically deleted from the regulations.

In addition to the due process privacy claim previously litigated, plaintiffs in this suit have raised equal protection claims which were not pursued in the prior case.

2. The corporate plaintiffs have a sufficient financial interest at stake in the outcome of the controversy to allow them standing to challenge the validity of the statute and regulations. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). The physician plaintiffs who are subject to criminal liability for violations of the regulations have the requisite interest to allow them to proceed with this action. Both individual and corporate plaintiffs assert threats of personal detriment sufficient to allow them to assert the rights of their patients. *Friendship Medical Center, Ltd. v. Chicago Bd. of Health,* 505 F.2d 1141 (7th Cir. 1974), *cert. denied sub nom. Chicago Bd. of Health v. Friendship Medical Center, Ltd.,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

3. M.C.L. § 333.1299 (M.S.A. § 14.15(1299)) establishes that a violation of the Public Health Code or a rule promulgated thereunder is a misdemeanor.

February 2, 1980. Upon assurance from the State that it would not seek to prosecute plaintiffs for their failure to apply for licenses pending resolution of the case on the merits, I denied plaintiffs' motion for preliminary injunction since irreparable harm was no longer threatened.

In the evidentiary hearing which followed, plaintiffs presented evidence to challenge the Act and regulations on due process and equal protection grounds. Plaintiffs argue that the regulatory scheme as a whole is an impermissible regulation of first-trimester abortions in violation of the due process right of privacy recognized in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Particular regulations are also attacked as unduly burdening that constitutional right, including Rules 26(2), 32, 33, 35(1), 35(3), 38, 47(5), 47(6), 51, 57(6), 66, 67 and 68, all of which will be described in greater detail later. Plaintiffs also claim that the State has irrationally chosen to regulate FSOFs while ignoring the private practice offices of doctors, dentists or podiatrists, where the same surgical procedures may be performed without regulation. Finally, plaintiffs contend that the State is selectively enforcing its regulations in singling out abortion clinics for licensure in violation of the equal protection clause.

## I. *Due Process*

### A. *Constitutional Standard*

■ Regulation which restricts the exercise of certain "fundamental rights" may be justified only by a "compelling state interest." *Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 728. *Kramer v. Union Free School District*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969). In the landmark cases of *Roe v. Wade, supra*, and *Doe v. Bolton, supra*, the Supreme Court established that a woman's decision whether or not to terminate her pregnancy is a fundamental right protected by the Constitution, and defined the State interests to be

weighed against a woman's privacy right at each trimester of pregnancy. During the first trimester, the stage of pregnancy relevant to this case, the privacy right of a pregnant woman is paramount. The State's interest in the health of the mother only becomes compelling at the end of the first trimester.[4] This means that

> *From and after this point, a State may regulate* the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; *as to the licensing of the facility*; and the like. [emphasis added]. *Roe, supra*, 410 U.S. at 163, 93 S.Ct. at 732.

The Court went on to hold:

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health. *Id.*, 410 U.S. at 164, 93 S.Ct. at 732.

Although the above language lends support to plaintiffs' argument that a licensing and regulatory scheme is *per se* unconstitutional as applied to first-trimester abortion facilities, an examination of cases decided since *Roe* makes it clear that *Roe* is not to be interpreted as precluding all state regulation during the first trimester. In *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975), for example, a statute proscribing any abortion by a non-phy-

---

4. In the last trimester of pregnancy, after viability of the fetus, the State may regulate to promote its interest in the potentiality of human life, and may proscribe abortion except

when necessary to preserve the life or health of the mother. *Roe, supra*, 410 U.S. at 164–165, 93 S.Ct. at 732.

sician was sustained even though some language in *Roe* would seemingly prohibit regulations as to the qualifications of the person performing a first-trimester abortion.[5] The Court upheld regulation in the first trimester with the following justification:

> ... [T]he insufficiency of the State's interest in maternal health is predicated upon the first trimester abortion's being as safe for the woman as normal childbirth at term, and that predicate holds true only if the abortion is performed by medically competent personnel under conditions assuring maximum safety for the woman. *Id.*, 423 U.S. at 11, 96 S.Ct. at 171.

The Court subsequently approved reporting and recordkeeping requirements which applied to facilities and physicians performing first-trimester abortions in *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), even though the regulations differed from those imposed on comparable medical procedures. The Court saw "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship" caused by the reporting and recordkeeping regulations. *Id.*, 428 U.S. at 81, 96 S.Ct. at 2846.

More recently the Court has articulated the standard for evaluating abortion regulations in terms of whether the regulation "unduly burdens the right to seek an abortion." *Maher v. Roe*, 432 U.S. 464, 473, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977), *quoting Belotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). Not all distinction between abortion and other procedures is forbidden. Rather "(t)he constitutionality of such distinction will depend upon its degree and the justification for it." *Belotti, supra*, 428 U.S. at 149–150, 96 S.Ct. at 2867. Insofar as the right established in *Roe v. Wade* protects a woman from "unduly burdensome interference with her freedom to decide whether to terminate her pregnancy," *Maher v. Roe, supra*, 432 U.S. at 473–474, 97 S.Ct. at 2382, it requires a consideration of both "the woman's interest and the nature of the State's interference with it." *Id.*, 432 U.S. at 473, 97 S.Ct. at 2382.[6]

Clearly, any regulation which interposes an absolute obstacle to a woman's freedom to choose to terminate her pregnancy during the first trimester would be constitutionally impermissible. Requirements of spousal, and for minors, parental, consent to an abortion were held unconstitutional in *Planned Parenthood of Missouri v. Danforth, supra*, because those provisions granted authority to a third person to unilaterally prevent the effectuation of an abortion

---

**5.** There is language in the *Roe* opinion suggesting that regulation of the person performing abortions would be permissible regardless of the stage of pregnancy.

> The State may define the term "physician" ... to mean only a physician currently licensed by the State, and may proscribe any abortion by a person who is not a physician as so defined. *Roe, supra*, 410 U.S. at 165, 93 S.Ct. at 733.

There is also language suggesting that general health regulations could be permissibly applied to first-trimester abortions.

> Of course, important state interests in the areas of health and medical standards do remain. The State has a legitimate interest in seeing to it that abortion, *like any other medical procedure*, is performed under circumstances that insure maximum safety for the patient. This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of after-care, and to adequate provision for any complication or emergency that might arise. [emphasis added]. *Id.*, 410 U.S. at 149–150, 93 S.Ct. at 725.

**6.** The nature of the constitutional right vindicated in *Doe* is described in *dicta* in *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), as

> the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion procedures [in *Doe*] were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution. *Id.*, 429 U.S. at 605 n.33, 97 S.Ct. at 879, fn. 33.

decision made by a woman and her physician.

A number of courts have also invalidated regulations which single out the abortion procedure without compelling justification for doing so, or which single out abortion clinics, but not other comparable facilities, for regulation. *See Arnold v. Sendak*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976), in which the Court summarily affirmed invalidation of an Indiana statute requiring that all first-trimester abortions be performed in a hospital or licensed health facility; *Mahoning Women's Center v. Hunter*, 610 F.2d 456 (6th Cir. 1979); *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141 (7th Cir. 1974), *cert. denied sub nom Chicago Bd. of Health v. Friendship Medical Center*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *Word v. Poelker*, 495 F.2d 1349 (8th Cir. 1974); and *Florida Women's Medical Clinic, Inc. v. Smith*, 478 F.Supp. 233 (S.D.Fla.1979).

The regulations before me in this suit differ from those invalidated in the above cases in that they apply generally to all freestanding surgical outpatient facilities without regard to the type of surgery performed, singling out abortion facilities in only a few provisions,[7] and because they do not require that first-trimester abortions be performed in a licensed facility.[8] In such a

---

**7.** The provisions which specifically apply to pregnancy terminations are Rule 33 (R. 325.-3833), Rule 47(5) and (6) (R. 325.3847(5) and (6)), and Rule 51 (R. 325.3851).

**8.** Although plaintiffs argue that the legislature impermissibly intended to single out abortion clinics for regulation, that factor in itself would not require invalidation of the legislation. Any impermissible motive the legislature may have had, such as a desire to prohibit abortions (which is not evident from the legislative history) is irrelevant if the effect of the legislation is not discriminatory or constitutionally burdensome on a woman's right to seek an abortion. The focus, as the Supreme Court explained in *Palmer v. Thompson*, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 1944–1945, 29 L.Ed.2d 438 (1971), should be on the actual effect of the enactment, not upon the motivation, or a collection of different motivations, which are difficult for a court to ascertain. *See also United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968).

While it is true that the legislature did focus on abortion clinics, the impetus for the legislation, as stated in the legislative analysis accompanying Senate Bill 888, was the perceived mismanagement of some clinics rather than a desire to limit the availability of abortions. The legislative analysis prepared by the Analysis Section, House of Representatives, Public Health Committee, 9/30/74, states:

*The Apparent Problem to Which the Bill Addresses Itself:*

In January of 1973, the U. S. Supreme Court ruled that a state may not prohibit abortions during the first 6 months of pregnancy, although the abortion procedures could be regulated after the third month. Since that time, several outpatient surgical facilities have been established whose primary (or sole) function is performing abortions. These facilities operate without any state regulation (other than voluntary guidelines established by the State Health Director). There have been numerous reports that many of these facilities flagrantly disregard even the most basic standards of good medical practice, including allegations of persons practicing medicine without a license, unsanitary conditions that could lead to dangerous or fatal infections, inadequate or nonexistent counseling services, failure to determine whether or not a woman is even pregnant before performing an abortion, and use of unsafe procedures. Although the state may not prohibit the abortion procedure itself, the state can and should license and regulate these facilities in order to ensure that they provide medical care of acceptable quality. *Argument For:*

Although the need for regulating abortion facilities provides the immediate impetus for the passage of this bill, its full beneficial effect would be much broader. The concept of performing minor surgical procedures outside of a hospital is gaining momentum in the medical community since there are many procedures that can safely (and inexpensively) be performed at out-patient facilities. The bill would also provide regulation for this type of facility.

The recent shocking reports on conditions within abortion clinics indicates that the voluntary guidelines established by the state health director are not being followed. The state should immediately take steps to regulate these clinics in order to protect the health and well-being of women treated in them.

This is not a situation in which abortion clinics are singled out by definitional exclusion (*see Aware Woman Clinic, Inc. v. City of Cocoa Beach, Florida*, 629 F.2d 1146, 1147, n.1 (5th Cir. 1980)), or where the facts surrounding the passage of the legislation demonstrate an obvious exclusionary effort aimed at a particular clinic (*see Fox Valley Reproductive Health*

situation of generally applicable health regulations, the U. S. Court of Appeals for the Seventh Circuit suggested in *Friendship Medical Center, Ltd. v. Chicago Board of Health, supra*, at 1154, albeit in *dicta*, that

> any general health regulations which would apply to first-trimester abortions would have to be limited so as to give effect to the fundamental rights as established by *Roe* and *Doe*; that is not be burdensome on a woman's right to decide to abort a pregnancy. By this we mean that in all probability nothing broader than general requirements as to the maintaining of sanitary facilities and general requirements as to meeting minimal building code standards would be permissible.

However, courts subsequently faced with constitutional challenges to facially neutral licensing regulations more detailed than the minimal regulations suggested by the Seventh Circuit have upheld them as valid exercises of the states' police powers. In *Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health, supra*, Judge Kennedy upheld Michigan's regulatory scheme, with the exception of two provisions, reasoning that the State was not precluded from "enforcing reasonable regulations that apply generally to insure the safety of all surgical procedures, even though first-trimester abortions are included among them ..." *Id.* at 475. A state clinic regulatory scheme in New York was sustained in *Westchester Women's Health Org., Inc. v. Whalen*, 475 F.Supp. 734 (S.D. N.Y.1979), where the court found that any interference with the process of obtaining an abortion caused by operation of the regulations would not intrude upon a woman's decision whether or not to terminate her pregnancy.

Similarly, the U. S. Court of Appeals for the First Circuit indicated it would find constitutionally permissible any licensing standards which apply "to like facilities performing medically analogous procedures, as long as they do not do so in a way that evades *Roe* by impinging on a woman's right to elect and obtain an abortion during the first trimester." *Baird v. Dept. of Public Health*, 599 F.2d 1098, 1102 (1st Cir. 1979). In reversing the lower court's summary judgment ruling that the Massachusetts licensing regulations were unconstitutional, the First Circuit held that expert evidence was essential to evaluate the question of the burdensomeness of particular regulations. Without any evidence on the question of the burden of the regulations on the abortion decision, the reasonableness of the regulations in terms of protecting the public health or safety, the impact on the availability of abortions in a "legally significant" manner, or of any selective enforcement of the regulations, the Court could only assume that the facially neutral regulations reflected a proper exercise of the State's power to safeguard the public health, safety and welfare. *Id.*

With these considerations in mind, I turn to the evidence presented in this case to see if any individual provisions challenged by plaintiffs are burdensome in a constitutional sense to their patients' rights. That interference must then be weighed against any valid state interest furthered by such section. If a fundamental right is not implicated by a particular provision, it need only satisfy the traditional test of judicial scrutiny for police power regulations. *Friendship Medical Center, Ltd. v. Chicago Bd. of Health, supra*, at 1155 (Fairchild, concurring). Finally, I must consider whether the combined effect of all the regulations not independently unconstitutional are so burdensome to the constitutional right at issue as to render the entire regulatory scheme invalid. *See Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172, 1200 (N.D.Ohio 1979).[9]

---

*Care Center v. Arft*, 446 F.Supp. 1072 (E.D.Wis. 1978)).

**9.** As the court pointed out in *Akron, supra*, [e]very regulation imposed upon first trimester abortions is going to have some impact upon a woman's right to decide to terminate her pregnancy. That is, any regulation that makes 'the physician's work more laborious

or less independent,' *Whalen v. Roe*, 429 U.S. 589, 605 n.33, 97 S.Ct. 869, 879 fn. 33, 51 L.Ed.2d 64 (1977), is at least, going to make it more expensive for a woman to effectuate her abortion decision. If the combined weight of a number of regulations, not independently unconstitutional, were to serve to make it unduly burdensome for a woman to

### B. *Evaluating the Regulations*

The Department of Public Health offered expert testimony at trial, primarily through Hermann A. Ziel, Jr., M.D., as to the departmental rationale and interpretation of those rules whose validity was challenged by plaintiffs. They are analyzed seriatim below.

### *Rule 32 (R. 325.3832) Transportation Services*

Rule 32 implements 1978 P.A. 368, § 20821(c), M.C.L. § 333.20821(c) (M.S.A. § 14.15(20821)(c)), which requires any freestanding surgical outpatient facility to

> (h)ave a written agreement with a nearby licensed hospital to provide for the emergency admission of postsurgical patients who for unpredictable reasons may require hospital admission and care.

Rule 32 itself provides that

> A facility shall have available immediately adequate transportation services for emergency patients requiring transfer to a hospital. A facility shall be located not more than 30 minutes normal travel time from the hospital with which written emergency admission arrangements are made. When indicated, a physician or nurse from the facility shall accompany the patient to provide emergency care enroute.

As the Department interprets the statute and regulation, an FSOF need only secure a written agreement with a physician having staff privileges at a local hospital, who agrees to act as admitting and attending physician for all patients, for the FSOF to be in compliance with the transfer agreement portion of Rule 32. The purpose of this rule—to avoid delays in emergency situations which might compromise the patient's life or health—is certainly a reasonable one and to be encouraged.

Nonetheless, I find that Section 20821(c) of Public Act 368 and the portion of Rule 32 referring to written emergency admission arrangements violate due process concepts because they delegate a licensing function to private entities without standards to guide their discretion. Even though plaintiff clinics encountered no problems in obtaining written transfer agreements with nearby hospitals,[10] the State acknowledged that some abortion clinics had experienced difficulty in securing written agreements with hospitals, and for that reason the State had accepted an agreement between an FSOF and a physician with staff privileges at a hospital as compliance with Rule 32 (letter from Walter Kron to Bette Huster, March 6, 1980, p. 1–2). Even if the State amended the Act and regulation to expressly allow an FSOF to obtain only an agreement with a physician with staff privileges rather than a direct agreement with a hospital, the constitutional infirmity would not be cured. A similar regulation was struck down in *Hallmark Clinic v. North Carolina Department of Human Resources*, 380 F.Supp. 1153 (E.D.N.C.1974), as an impermissible delegation of state power, since it conferred upon hospitals the ability to arbitrarily veto the operation of abortion clinics by withholding transfer agreements or denying staff privileges.[11]

The fact that the transfer agreement applies to all FSOFs, rather than only to abortion clinics, does not change the result.[12] The Act and Rule 32 require a writ-

---

carry out her decision, those sections would be invalid. *Id.* at 1200, n.22.

**10.** Two of the plaintiff clinics have written transfer agreements with three hospitals. Dr. Julio Acosta testified that hospitals were generally willing to enter written transfer agreements in order to insure that the transferring clinic will be financially responsible for the care of the patient while in the hospital. (Acosta, 5/29/80, Tr. at 159–160).

**11.** The regulation at issue in *Hallmark* initially required a " 'Transfer Agreement' with a local hospital and emergency transportation service to assure the patient access to hospital care

within 15 minutes." The Department subsequently amended this provision to allow waiver of the written transfer agreement directly with a hospital if "all physicians operating in a freestanding abortion clinic ... document that they are active members of a licensed hospital's medical staff and shall have verified credentials and adequate admitting privileges." *Hallmark, supra,* at 1156.

**12.** *But, see Westchester's Women's Health Organization, Inc. et al. v. Whalen,* 475 F.Supp. 734, 741, n.13 (S.D.N.Y.1979), which upheld a requirement for a written transfer agreement with an appropriate back-up medical facility

ten transfer agreement with a hospital as a necessary step toward licensure for an FSOF. The defect lies in the delegation of unguided power to a private entity, whose self-interest could color its decision to assist licensure of a competitor. Similar delegations of licensing functions have met with judicial disapproval. *Blumenthal v. Bd. of Medical Examiners*, 57 Cal.2d 228, 18 Cal. Rptr. 501, 368 P.2d 101 (1962); *Group Health Ins. of New Jersey v. Howell*, 40 N.J. 436, 193 A.2d 103 (1963); *Fink v. Cole*, 302 N.Y. 216, 97 N.E.2d 873 (N.Y.Ct.App. 1951); *Union Trust Co. v. Simmons*, 116 Utah 422, 211 P.2d 190 (1949); *see generally*, Liebmann, *Delegation to Private Parties*, 50 Ind.L.J. 650, 695–705 (1975).

The power to prohibit licensure may not constitutionally be placed in the hands of hospitals. Such an impermissible delegation without standards or safeguards to protect against unfairness, arbitrariness or favoritism is void for lack of due process. *Hallmark Clinic v. North Carolina Department of Human Resources, supra*, at 1158–1159; *Group Health Ins. of New Jersey v. Howell, supra*, 193 A.2d at 109. The State, of course, can require an FSOF to make a concerted effort to obtain a written transfer agreement with either a hospital or a physician with staff privileges at a hospital, but cannot condition licensure upon receipt of such approval unless standards are provided.

Additionally, I find that the rule is non-severable and thus it fails in its entirety.

*Rule 33 (R. 325.3833) Counseling and referrals for subsequent care*

Rule 33. (1) When procedures having present or future social implications for a patient are performed, such as human sterilizations or pregnancy terminations, or when indicated in other situations, a facility shall make available and offer appropriate counseling, interpretation and referral for subsequent indicated care.

To accomplish this, a facility shall:

(a) Provide through physicians, qualified nurses, social workers or specially trained and qualified counselors for appropriate assistance and counseling as needed.

(b) Maintain liaison with and make indicated referrals to community counseling, family planning or other social and health service agencies to help assure appropriate and adequate subsequent care of the patient.

(c) Provide such counseling or assistance without coercion.

(2) Counselors, other than a responsible physician, should consult with the physician concerning results of counseling and the initiation of any referrals that seem necessary.

(3) An appropriate method for providing information to and receiving information from legitimate referral sources shall be established including adequate mechanisms for the scheduling and fulfilling of advance appointments requested by a referral source.

■ The testimony regarding this rule clarifies that counseling is not mandatory for procedures with "significant social implications" for the patient; the facility need only have it available. The language which reads "a facility shall ... provide such counseling or assistance without coercion" is meant only to direct the manner in which counseling is to be made available, and not to force each patient to submit to counseling. Considerable discretion is allowed to a facility in applying this rule and no particular qualifications are required of the person doing the counseling or as to the content of what the patient is told. Consequently, counseling could be performed by the existing medical staff, or a lay counselor as the facility desires. Dr. Ziel expressed the Department's interpretation of the rule's purpose as being to insure a patient's informed, voluntary consent to the procedure, and not

"located in or near the same community", distinguishing that requirement from those invalidated in other cases because it "applies to health facilities generally and is far less restrictive."

to dissuade a woman from her choice.[13] (Ziel, 6/25/80, Tr. at 494–504). To the extent that counseling is not imposed upon patients and the content not proscribed, Rule 33 on its face does not unduly burden a woman's right to seek to terminate her pregnancy and is rationally related to a legitimate state interest in insuring informed consent. Therefore, I find it to be constitutionally valid.

Plaintiffs, however, contend that the State's application of Rule 33 is impermissible, and elicited testimony at trial regarding the manner in which one Department official applied the counseling and recordkeeping requirements during a departmental survey of an abortion clinic which is not a plaintiff in this case. (McKean, 6/26/80, Tr. at 56–65). The following portion of the Department's survey report was read into the record:

> All records reviewed lacked documentation regarding the counseling. The counselor's note should consist of statements regarding the patient's feeling towards her decision, her awareness, understanding of the procedure and possible complications, instructions for aftercare and referral to the community agents [sic] when necessary; documentation ratings will all meet Rule 47.2(ck) [sic], sample forms are attached to this report.

(McKean, 6/26/80, Tr. at 59)

The Department official indicated that she generally gave this sort of statement in talking with clinic personnel about counseling practices, but that sample counseling forms were not typically distributed to clinics. She further stated that the sample form (P.Ex. 15)[14] was not prepared by the Department nor given to her by members of the Department, but was a form used by another clinic which she only gave out as a sample upon the request of a clinic seeking assistance.

■ Requiring written, informed consent of a patient prior to a first-trimester abortion is not constitutionally objectionable. *Planned Parenthood v. Danforth, supra,* 428 U.S. at 67, 96 S.Ct. at 2840; *Abortion Coalition of Michigan, Inc. v. Michigan Dept. of Public Health, supra,* at 477. Regulation in the area of counseling, though, strikes close to the essence of the constitutional right of privacy established by *Roe* and *Doe*—the right of a woman in consultation with her physician to decide to terminate her pregnancy. Of relevance to a determination of the limits on State regulation in the area of counseling is the Supreme Court's footnote in *Danforth, supra,* as to the meaning of "informed consent".

> [W]e are content to accept, as the meaning [of informed consent], the giving of information to the patient as to just what would be done and to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession. *Id.* 428 U.S. at 67 n.8, 96 S.Ct. at 2840 fn. 8.

Another court has invalidated a provision in a city ordinance which included a list of items that a physician was required to tell his or her patient prior to the abortion procedure. Such intrusion was held constitutionally impermissible in *Akron Center for Reproductive Health v. City of Akron,* 479 F.Supp. 1172, 1203 (N.D.Ohio 1979). The Court has no doubt that the state could constitutionally require that all abortion patients be counselled, either by their attending physician or another indi-

---

**13.** Dr. Ziel endorsed the counseling standards published by the National Abortion Federation (P.Ex. 13), an organization in which two of the plaintiff clinics are members (Chelian, 6/20/80, Tr. at 81–82). He testified that the State had a similar philosophy and objective behind its regulation of counseling—that "counseling should be offered but not imposed and should not constitute a barrier to service. Counseling should always be consistent with the needs of the woman ... [and] complete confidentiality of conversations and written records must be maintained by both the counselor and the agency." (Ziel, 6/25/80, Tr. at 502–503, P.Ex. 13, p. 1).

**14.** The sample form (P.Ex. 15) consists of a three-page checklist of information to be given to a patient as well as personal information to be obtained regarding the woman's abortion decision.

vidual having specified minimum qualifications. The state cannot, however, go beyond that to specify what each patient must be told. That determination must be left to the individual counselor based upon the needs of the particular patient. Otherwise, the physician is being placed in the "undesired and uncomfortable straitjacket" warned against by the Supreme Court.

This is not impermissible because of any perceived interference with rights of the physician. Rather, it is impermissible because it interferes with the woman's right to consult a physician who is free from such state interference.

■ Although it may be unwarranted to infer a departmental practice from an isolated instance, a caveat is nonetheless appropriate. Requiring that a counselor's notes include "statements regarding the patient's feeling towards her decision" is unduly intrusive into the privacy of a woman's decision whether or not to terminate her pregnancy. Although it is permissible under the Constitution and these rules to require an informed consent and a recording of any referrals made, aftercare instructions given, or of the fact that counseling occurred, the State should refrain from imposing requirements regarding the content of the counseling sessions or the retention of a counselor's notes. *See Margaret S. v. Edwards*, 488 F.Supp. 181, 213–214 (E.D.La. 1980).

*Rule 35(1) (R 325.3835) Physician Qualifications*

A physician, podiatrist or dentist performing surgery in a facility shall possess adequate qualifications acquired by special training and experience to evaluate the medical, podiatric or dental conditions, potential risks, recognize and adequately treat emergency complications encountered in any procedure undertaken, and perform the procedure in accordance with the usual standards of medical, podiatric or dental practice.

■ Plaintiffs did not pursue their objections to this rule after clarification by the State that this rule does not require a specialist to perform abortions, despite the reference in the rule to "special training." The rule essentially only requires that a physician, dentist or podiatrist be qualified to do whatever he or she undertakes. (Ziel, 6/25/80, Tr. at 504). Under *Roe*, the State cannot define the term "physician" to mean more than "a physician currently licensed by the State." *Roe, supra*, 410 U.S. at 165, 93 S.Ct. at 733. Despite all its excess language, Rule 35(1) does not exceed this limitation to any significant degree and I find it to be constitutional.

*Rule 38 (R 325.3838) Medical Reviews*

The conduct of the work of a facility shall be regularly and frequently reviewed by the appropriate medical staff committee (tissue, medical audit or utilization, medical records) in a hospital operated facility to assure maintenance of high standards and quality of care. In other facilities, comparable arrangements acceptable to the director for impartial medical surveillance and review of the quality of care provided shall be made.

■ The ambiguity of what is required for FSOFs which are not hospital operated to make "comparable arrangements acceptable to the director" was clarified to some extent by the Department's interpretation of this rule at trial. Richard D. Yerian, M.D., a Department official, stated that the Director has accepted as a minimum at other FSOFs an arrangement to have a physician who does not have surgical privileges at the facility "visit the facility four times a year, and at a minimum, review those charts that have recorded complications and a few other unspecified number, selected at random and merely give a written report to the facility indicating any suggestions or comments that he might have relative to possible ways of improving the quality of patient care." (Yerian, 5/29/80, Tr. at 165).

Plaintiffs objected to this rule as unnecessary and unduly expensive,[15] though their predictions of cost were diminished somewhat by the departmental interpretation of what was necessary for compliance. I do not find that this rule in itself in any way burdens a woman's right to seek an abortion. Because it is rationally related to the State's legitimate interest in insuring compliance with health regulations, I conclude that it is constitutionally valid.

*Rule 47 (R 325.3847) Medical Records*

\* \* \* \* \* \*

(5) A facility in which pregnancy terminations are performed shall maintain records of the procedures, and shall file reports and furnish statistical and such other information as may be required by the director. These shall be reported on forms provided by the director in accord with definitions and notification procedures as he may specify. They shall be signed in each instance by the physician performing the procedure. The report forms shall not require identification of the patient undergoing the procedure.

(6) Failure or refusal of a facility to file the notification of termination of pregnancy properly executed and personally signed by the responsible physician is sufficient cause for immediately beginning proceedings for revoking the license and closing the facility.

\* \* \* \* \* \*

Plaintiffs' objections to the recordkeeping provisions focus primarily on Rules 45(5) and 45(6). The remaining provisions of Rule 47 were not challenged.[16] Dr. Julio

**15.** Plaintiff Julio Acosta, M.D., testified that the "going rate" for a physician participating in medical records review was $200 an hour, but he could not estimate how many hours a records review would take for a particular clinic. (Acosta, 5/29/80, Tr. at 167).

**16.** The remaining portions of Rule 47 read as follows:

(1) Medical records shall be originated on all patients undergoing surgery, signed by the responsible physician, indexed and so filed as to assure their ready access and future availability. They shall be maintained in accordance with a written retention policy acceptable to the director. In a hospital operated facility, the record keeping shall be incorporated into the hospital medical records system, including and subject to its established retention policies.

(2) Medical records shall contain as a minimum:

(a) Patient identification, including name, address, marital status and birthdate.

(b) Medical history.

(c) Physical examination.

(d) Medical orders signed by the responsible physician.

(e) Laboratory findings.

(f) Special examination findings, for example, x-ray or electrocardiogram.

(g) Preoperative and final diagnosis.

(h) Nurses' notes which shall include a recording of vital signs, pre- and postoperatively, color, appearance and other relevant observations with such frequency postoperatively as to document the patient's stabilized condition at time of discharge.

(i) Record of the sedation and anesthetic used by product name and dosage, identity of anesthetist if other than the surgeon, procedure and any pertinent information concerning results or reactions.

(j) Written consultation reports signed by the consultant.

(k) Social or social service information relevant to the case.

(*l*) Surgeon's operative note including naming of procedure performed, physician performing surgery, anesthetic agent used, names of assistants (whether another physician, a nurse or specially trained technician), duration of procedure and any unusual problems or occurrences encountered, and surgeon's description of gross appearance of tissues removed.

(m) Physician's progress notes and discharge note. The physician's progress and discharge notes may be combined in the patient's clinical record.

(n) Summary of instructions given for followup observation and care as well as recording of all referrals for counseling, family planning or other medical conditions requiring further attention.

(*o*) Identification of the physician who actually discharges the patient.

(3) Medical records shall be available for survey and review of content at any time by authorized members of the department.

(4) Medical records shall be maintained as confidential documents with the following exceptions:

(a) Information required under these rules.

(b) Information required by law.

(c) Information authorized for disclosure by written release by the patient.

Acosta testified that two of the plaintiff clinics currently maintained permanent medical records on all patients which meet the requirements of Rule 47(2).

Reporting and recordkeeping provisions applicable to abortions at all stages of pregnancy were challenged in *Planned Parenthood of Missouri v. Danforth, supra.* The Court held that:

Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible.... As to the first stage, one may argue forcefully, as the appellants do, that the State should not be able to impose any recordkeeping requirements that significantly differ from those imposed with respect to the other, and comparable, medical or surgical procedures. We conclude, however, that the provisions of §§ 10 and 11,[17] while perhaps approaching impermissible limits, are not constitutionally offensive in themselves. Recordkeeping of this kind, if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to the decisions involving medical experience and judgment. The added requirements for confidentiality, with the sole exception for public health officers, and for retention for seven years, a period not unreasonable in length, assist and persuade us in our determination of the constitutional limits. As so regarded, we see no legally significant impact or consequence on the abortion decision or on the physician-patient relationship. *Id.* 428 U.S. at 80–81, 96 S.Ct. at 2846.

Because the Act being reviewed in *Danforth, supra,* did not set forth in detail the information to be recorded on forms supplied by the relevant State agency, the Court added the following caveat:

We naturally assume, furthermore, that these recordkeeping and record-maintaining provisions will be interpreted and enforced by Missouri's Division of Health in the light of our decision with respect to the Act's other provisions, and that, of course, they will not be utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction. *Id.*

■ I find nothing intrusive or unduly burdensome in the report which the Department now requires FSOFs to file for statistical purposes (P.Ex. 8). It consists of a half-page form entitled "Abortion Report" with nineteen items to be filled in regarding each abortion procedure, excluding the name of the patient, which is signed by the physician performing the procedure. Insofar as this report ensures a patient's privacy

\*　\*　\*　\*　\*　\*

(7) Information submitted by a referral source shall become an integral part of the clinical record of the patient.

**17.** The relevant provisions of the Missouri statute are set forth in *Planned Parenthood of Missouri v. Danforth,* 392 F.Supp. 1362, 1366 (E.D.Mo.1975), as follows:

Section 10. 1. Every health facility and physician shall be supplied with forms promulgated by the division of health, the purpose and function of which shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law.

2. The forms shall be provided by the state division of health.

3. All information obtained by physician, hospital, clinic or other health facility from a patient for the purpose of preparing reports to the division of health under this section or reports received by the division of health shall be confidential and shall be used only for statistical purposes. Such records, however, may be inspected and health data acquired by local, state, or national public health officers.

Section 11. All medical records and other documents required to be kept shall be maintained in the permanent files of the health facility in which the abortion was performed for a period of seven years.

and is not burdensome in requiring unnecessary detail, it meets the constitutional standard set forth in *Danforth, supra.*

■ Two of the plaintiff physicians in this case object to the requirement that a physician must sign the Abortion Report, asserting that their own right of privacy should be equal to that of their patients. Although they agree that the information is useful to the State for statistical purposes, their concern is that doctors may be subject to harassment from individuals or groups opposed to abortions who may be able to obtain the names of physicians who perform abortions from the Department. (Acosta, 6/5/80, Tr. at 211; Goldfine, 6/6/80, Tr. at 349–350).

Although the concept of a constitutional right of privacy is still largely undefined,[18] it is clear that the nature of the interest the doctors claim is not of constitutional dimensions. *Margaret S. v. Edwards*, 488 F.Supp. 181, 218 (E.D.La.1980). The doctors in this instance cannot assert the constitutional rights of their patients to privacy with respect to the abortion decision, since the patients' privacy interests are not violated by the anonymous report, and the doctor's right to assert such a claim has no greater strength than that of his or her patient. *Whalen v. Roe*, 429 U.S. 589, 604–605 n.33, 97 S.Ct. 869, 879 fn. 33, 51 L.Ed.2d 64 (1977).

■ The "right to engage in any of the common occupations of life", another form of the privacy interest which is protected by the Fourteenth Amendment, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), does not guarantee the freedom to practice medicine without state regulation. *Akron Center For Reproductive Health, Inc., supra*, at 1198. Requiring a doctor's signature to verify the accuracy of medical data is a reasonable and minimally burdensome regulation which is required of the medical profession in many situations.

To the extent that the interest at stake is not to have private matters made public by the government (*see e. g. Whalen v. Roe, supra*, 429 U.S. at 599 n.24, 97 S.Ct. at 876 fn. 24), it is doubtful that information as to the type of surgery a doctor performs creates an expectation of privacy when it can be readily obtained from other sources. Moreover, the record does not support plaintiffs' apprehensions about disclosure of their names. No evidence of such disclosures of physicians' names by the Department in the past was presented, and Dr. Yerian from the Department assured the Court that doctors' names were not given out to the public. (Yerian, 6/6/80, Tr. at 353).

I conclude that Rules 45(5) and 45(6) do not violate the constitutional rights of any of the plaintiffs or their patients, and are rationally related to a legitimate governmental interest in gathering statistical information to protect the health of its citizens.

*Rule 51 (R 325.3851) Pregnancy Terminations*

> If pregnancy terminations [sic] procedures are to be performed in the facility, the owner or governing body shall adopt and enforce written policies to govern the procedures. Policies shall include the restriction that only uncomplicated pregnancies of not over 14 weeks' duration may be performed in a facility unattached to or physically remote from a parent hospital. Duration is computed from the first day of the woman's last menstrual period or by other clinical evaluative methods documented in the record.

■ As a regulation which singles out the abortion procedure, the State must demonstrate a compelling interest for the differentiation from other comparable medical procedures. In explanation of this regulation, Dr. Ziel testified that the poli-

18. *See Whalen v. Roe, supra*, 429 U.S. at 599 n.24, 97 S.Ct. at 876 fn. 24 (1977), *quoting* Kurland, "The Private I", the University of Chicago Magazine 7, 8 (autumn 1976).

cies referred to in the first sentence are "left almost entirely to the discretion of the governing board of the institution with the exception of the specificity that it must include the requirements of the second sentence . . .". (Ziel, 6/26/80, Tr. at 13). The State's purpose in requiring the fourteen-week limit is its interest in protecting the welfare of women in the second trimester of pregnancy. (Ziel, 6/26/80, Tr. at 14).

Plaintiffs argue that this rule authorizes policies by the governing body of a facility which will intrude upon the doctor-patient relationship and interfere with a doctor's exercise of professional judgment. Rule 51 by its terms, however, does not require anything more than a policy restricting performance of abortions in FSOFs to uncomplicated pregnancies of not over fourteen weeks' duration, and includes a means of verifying duration. Any additional policies are optional under the rule; therefore, if a doctor finds such a policy interferes with his or her professional judgment, that is a matter between the doctor and governing body of an FSOF and cannot be deemed state intrusion of any sort.[19]

I find that the State's interest in the health of the mother, which becomes a compelling interest at the second trimester justifies the requirement of a policy that pregnancies after that point shall not be terminated in an FSOF.

*Structural Equipment and Staffing Rules*

A number of the regulations challenged by plaintiffs relate to structural, equipment and staffing requirements which plaintiffs contend will result in a substantial increase in the abortion fee charged to cash-paying patients or which may cause the clinics to close. In this regard, plaintiffs specifically object to Rules 26(2), 68(1), 35(3), 57(6), 66, 67, and 68(2)–(8).[20] I conclude, however, that plaintiffs' argument that these provi-

---

**19.** Since the Department does not define what constitutes an uncomplicated pregnancy but has stated that it would look to the medical staff of the facility for such a definition (Ziel, 6/26/80, Tr. at 46–47), I am assuming that a facility or physician could not be prosecuted for performing an abortion based on the State's or a prosecutor's differing definition of what a complicated or uncomplicated pregnancy is.

I note in this regard that the State's authority to intrude into the medical judgment of a physician as to the treatment to be provided is limited by M.C.L. § 333.20132(1) (M.S.A. § 14.-15(20132)(1)), which states that "[t]he department shall not regulate the medical or surgical treatment provided to an individual by his or her attending physician in a health facility or agency."

**20.** The text of these rules is set forth below.
*Rule 26(2) (R 325.3826(2))*
A qualified physician shall be present on the premises of a facility through the postoperative period of a patient's stay in the facility.
*Rule 68(1) (R 325.3868(1))*
Patient observation and recovery areas shall be provided in sufficient numbers to accommodate the patient load with a planned minimum of a 3-hour recovery period and longer when necessary for individual patients. They shall be comfortably furnished and adequately equipped for the patient's safe postoperative observation and recovery.
*Rule 35(3) (R 325.3835(3))*
A qualified anesthesiologist or anesthetist shall be on the staff and when medically indicated, participate in the selection of the most appropriate anesthetic agent to be used and be present to supervise or actually administer the anesthetic when procedures are undertaken which require such participation.
*Rule 57(6) (R 325.3857(6))*
Emergency electrical service shall be permanently installed to provide lighting in corridors, exits, procedure rooms, recovery rooms, congregate rooms, nurse stations and other critical areas. In new construction or renovations, an emergency generator with automatic transfer switch or an alternative source of immediate electrical power acceptable to the director shall be provided for lighting and operation of equipment necessary to patient care.
*Rule 66 (R 325.3866)*
(1) Examination rooms shall be provided adequate to meet the volume of work to be accomplished, and each room shall provide a minimum of 70 square feet of usable floor space. In new construction or renovations, 80 square feet of usable floor space shall be provided.
(2) An examining room shall have a hand-wash lavatory within the room, equipped with a gooseneck inlet and wrist, knee or foot controls.
(3) A change area shall be provided for patients and provision made for the safe storage of their personal effects.
(4) Operating or procedure rooms shall be provided adequate to meet the volume of work to be accomplished, and each room

sions impinge upon the fundamental right of privacy recognized in *Roe* is unsound. Even assuming that a substantial increase in the cost or decrease in the availability of abortions would unduly burden a woman's right to choose to terminate her pregnancy,[21] plaintiffs have not proved such an impact as a factual matter.

shall provide a minimum of 120 square feet of usable floor space. In new construction, 150 square feet of usable floor space shall be provided.

(5) Explosive anesthetic agents shall not be used in the rooms.

(6) A supply of oxygen with appropriate masks or other means of administration shall be available in each room.

(7) The room shall be designed to permit transfer of a patient from the table to a stretcher and to permit sufficient clearance on either side and at the foot of the table with necessary equipment and supplies in place.

(8) A nurse call signal shall be provided from the procedure and examining room to a central control station.

(9) A scrub sink with gooseneck outlet shall be available in or adjacent to the procedure rooms.

(10) Single use soap, scrub brushes and towels shall be utilized in patient care areas.

(11) The room shall contain a suitable operating table and other equipment necessary for the types of procedures to be accommodated.

(12) Space for and sterilization equipment shall be provided to process all medical supplies which require sterilization between uses. Equipment shall have sufficient capacity to accommodate the work load of the facility, and controls acceptable to the director shall be used to check effectiveness and assure sterilization.

*Rule 67 (R 327.3867)*

(1) Medication work and storage areas shall be provided adequate to meet the volume of work to be accomplished.

(2) A shelf or desk shall be provided for the nurse's use in preparing and administering medications and recording of information in patients records and shall be within and readily accessible to all patient care areas for which that nursing station has responsibility.

(3) A medication storage and preparation area equipped with a sink with a gooseneck inlet and hot and cold water and locked storage for medications shall be provided. This shall include adequate space for the safe storage of medications, fluids and electrolyte solutions in a safe and sanitary manner.

(4) Space shall be available for the storage of clean linens, equipment, supplies, wheelchairs and stretchers.

(5) A soiled utility room shall be available for temporary holding of waste materials and cleaning of items to be reused.

(6) A janitor's closet with service sink shall be available.

*Rule 68 (R 325.3868)*

\* \* \* \* \* \*

(2) A facility shall provide at least 1 recovery room equipped for the use by and observation of patients requiring recumbent care post-surgically. A minimum of 1 hospital type bed or wheeled recovery room stretcher shall be provided for each 10 post-surgical patients to be cared for at any one time.

(3) Single bed/stretcher recovery rooms shall provide a minimum of 100 square feet of usable floor space.

(4) Multiple bed/stretcher recovery rooms shall provide a minimum of 80 square feet floor space per bed or stretcher.

(5) A recovery room shall be designed to provide a minimum of 3 feet between beds or stretchers and 4 feet of clearance at the foot of the bed or stretcher.

(6) Comfortably furnished congregate rooms equipped with either reclining or lounge type chairs or cots may be provided for the post-surgical observation of patients not needing beds or stretcher accommodations. Each congregate type room shall provide a minimum of 50 square feet of usable floor space for each patient to be accommodated. A congregate room shall not contain accommodations for more than 12 patients.

(7) A toilet and lavatory shall be provided for each 6 recovery patients as a minimum. 1 or more bathing facilities are recommended.

(8) Corridors used for patient entry, egress and for surgical care areas in a facility shall have a minimum width of 6 feet.

21. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), a state regulation limiting Medicaid benefits for first-trimester abortions to those that are "medically necessary" was held to be constitutional even though indigency would make it difficult or impossible for some women to have abortions. The Court reasoned that the regulation placed no restriction on access to abortion that was not already there. *See Westchester Women's Health Org., Inc. v. Whalen, supra*, at 741 (clinic licensing regulations which may increase the cost of an abortion as such a facility does not constitute an undue interference with the abortion decision). *But see Mahoning Center v. Hunter, et al., supra*, at 460, ("the ordinance, by imposing costly and unnecessary restrictions, is designed to burden and deny in a similar way the effective enjoyment of a choice reserved to the individual by the Constitution . . . Only the middle class and well-to-do would be able to afford the operation.").

Plaintiffs submitted estimates of the cost of renovation in the four clinics to meet structural requirements and estimates of additional staffing costs the plaintiffs interpret the regulations to require. There are difficulties with both sets of figures, as defendant points out.

An architect testified at length for plaintiffs to establish how she arrived at the total estimate for bringing each facility into compliance. (Pickens, 5/28/80, Tr. at 4–71; 5/29/80, Tr. at 84–150). However, no correlation is made between the projected expenses and the impact on the fee charged per patient which could vary greatly, depending on the period of time necessary to repay the construction loan, or whether the clinic shareholders would be able and willing to absorb the loss or forego some of the clinics' profits,[22] if any.

There is also merit to defendant's argument that the real measure of the cost burden at this point in time should require a determination of what additional construction costs would have been incurred if, in the original construction of the plaintiff clinics, the State's earlier voluntary guidelines on abortion facilities had been followed.[23] The choice to disregard some of those guidelines, defendant suggests, was merely a mistaken business judgment which should not now be overlooked in calculating the cost of compliance with the regulations.[24]

Plaintiffs' figures on estimated increased operating costs for two of the clinics[25] present problems of a different sort. The projected increase in the abortion fee for cash-paying patients is premised on an overly-literal reading of three provisions—Rules 26(2), 68(1) and 35(3). As defendant has clarified, the purpose of the language referring to a "planned minimum of a 3-hour recovery period" in Rule 68(1) is solely to establish space requirements and does not mandate that patients remain in a facility any longer than necessary for recovery, in the judgment of the attending physician. There was testimony that the average recovery time for the abortion procedure in two of the plaintiff clinics is one hour (Chelian, 6/6/80, Tr. at 370–371). Accordingly, clinic staff, including the physician responsible for discharging the last patient as required by Rule 26(2), need not be hired to remain on the premises for a minimum of three hours after the last abortion of the day is performed.

Similarly, plaintiffs' estimated costs for complying with Rule 35(3) appear to be higher than the regulation actually requires. Plaintiffs calculated only the cost of hiring an anesthesiologist to be "on call", who is defined as "a physician specializing

22. Although there was testimony that the two branches of the Northland Family Planning Clinic, Inc. are non-profit corporations (Chelian, 6/6/80, Tr. at 316), that information was not presented for the other two plaintiff clinics.

23. The guidelines for abortion facilities were developed by an ad hoc committee convened in July of 1971 by the Michigan Department of Public Health in anticipation of possible changes in Michigan's abortion law due to a referendum on the November 1972 ballot. (Ziel, 6/25/80, Tr. at 461–462, 470–472).

24. The Department also points out that there is a statutory provision which has been applied to ease the financial burden for other facilities by allowing licensure upon approval of a long-term "plan of correction" for bringing a facility into structural compliance. M.C.L. § 333.20144 (M.S.A. § 14.15(20144)) provides:

A health facility or agency not meeting statutory and regulatory requirements for its physical plant and equipment may be licensed by the department on the basis of a building program approved by the department which:
(a) Sets forth a plan and timetable for correction of physical plant or equipment deficiencies and items of noncompliance.
(b) Includes documented evidence of the availability and commitment of money for carrying out the approved building program.
(c) Includes other documentation the department reasonably requires to assure compliance with the plan and timetable.

25. Increased staffing costs were calculated for both branches of the Northland Family Planning Clinic, Inc. (Chelian, 6/20/80, Tr. at 55–81).

in the field of anesthesiology." Rule 325.-3801(4). However, contracting with an anesthetist, who could be a nurse or lay person who has had "special training and experience under medical auspices in the administration of anesthetics," (R. 325.-3801(5)), would be sufficient to comply with the regulation,[26] and likely less costly.

The evidence which does the most damage to plaintiffs' argument that the regulations will drastically affect the cost and perhaps the availability of abortions is the existence of ten licensed clinics in southeastern Michigan where first-trimester abortions are performed, which in some cases charge less than the plaintiff clinics for an abortion procedure. (10/22/80, Tr. at 23–58). Admittedly, those clinics were licensed on the basis of their "substantial compliance" rather than strict compliance with the regulations and, as plaintiff contends, the fact of their licensure cannot be used to rebut plaintiffs' contention that the cost of complying with the regulations is unduly burdensome. It may be that those clinics would have to raise their fees or may be forced out of business if strict compliance is ever required. There is no way to verify these speculations on the record before me.

Nonetheless, I do find it significant that the availability of reasonably priced abortions will not be drastically curtailed even if the plaintiff clinics should cease operating due to the cost of complying with the regulations. I find that the impact of these structural, equipment and staffing regulations, in combination with all the other rules challenged by plaintiffs, does not un-duly burden a woman's right to seek an abortion. Consequently, the regulations will be upheld if they are reasonably related to a legitimate state purpose. *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

With the exception of Rule 32 discussed above, I conclude that all but one of the remaining regulations are rational means of furthering the State's interest in the health and safety of its residents based on the expert testimony presented at trial. The exception is Rule 68(8), which requires six-foot corridors in all FSOFs. I find that such a requirement is not reasonably related to the State's interest in assuring adequate health care for its citizens.

Two of the plaintiff physicians testified that the six-foot corridor requirement was unnecessary and did not contribute to patient health or safety. Each believed that corridors in the facilities in which they perform abortions, Northland Family Planning Clinic and Birth Control Center, which have corridor widths of five feet, eight inches and four feet respectively, are adequate for proper patient care. (Acosta, 5/29/80, Tr. at 174–174; 6/5/80, Tr. at 199; Goldfine, 6/6/80, Tr. at 357–358).[27] The State conceded that a five-foot, eight-inch hallway would be in substantial compliance with Rule 68(8), although there is no variance provision written into the rules. The Department's Director has the discretion under the rule to deny licensure to any FSOF if the corridors are not six feet wide.

The Department's justification for requiring a six-foot corridor is that some mini-

---

**26.** Defendant argues that plaintiffs' cost estimate is inflated because a clinic would not need to pay an anesthesiologist or anesthetist a full wage to be on call or available for consultation during every hour that abortion procedures are performed. The only evidence to substantiate this on the record is the testimony of one director of a licensed abortion clinic in Detroit who testified that he had a written agreement with an anesthesiologist to provide consultation when such services were indicated, but who was not otherwise paid a fee. (Glover, 10/22/80, Tr. at 33).

Apparently this provision is not widely enforced, since only one of the ten licensed clinics, whose representatives testified in court, had some arrangement for the services of an anesthesiologist or anesthetist as the regulations seem to require.

**27.** Dr. Goldfine testified that there had been one emergency situation in which a patient had been moved from the Birth Control Center on a stretcher. (Goldfine, 6/6/80, Tr. at 362).

mum dimension needed to be established to "permit a safe and functional traffic flow of patients [and] care providers," and provide "adequate circulation space ... [and] adequate room for equipment" (*e. g.* stretchers), keeping in mind that any licensed FSOF is entitled to provide a broad spectrum of surgical procedures. (Ziel, 6/25/80, Tr. at 482–483). The Department pointed out that the committee which formulated the regulations was chaired by a physician and comprised of a broad cross-section of health care professionals, as well as Department employees and members of population planning organizations. (Ziel, 6/25/80, Tr. at 473–474). One Department employee who was a member of that group described the manner in which the group went about deciding on procedure room dimensions by researching the size of various pieces of equipment necessary in such a room and drawing a room layout which could accommodate them. (D.Ex. 1, Drake, 6/26/80, Tr. at 69–71); There was no testimony, however, as to how the six-foot corridor dimension was selected. Moreover, the State's expert witness, Dr. Ziel, responded that he would not be opposed to four-foot corridors if they were found to provide adequate space. (Ziel, 6/25/80, Tr. at 484).

 Although the State is justified in establishing a minimum dimension for corridors in FSOFs, a six-foot minimum appears from the testimony presented to be arbitrary and excessive, particularly as it applies to existing facilities.[28] No police regulation should be allowed "to interfere with the enjoyment of individual rights beyond the necessities of the case." *California Reduction Co. v. Sanitary Reduction Works*, 199 U.S. 306, 318, 26 S.Ct. 100, 103, 50 L.Ed. 204 (1905). Consequently, I find that Rule

68(8) is invalid under the due process requirement that there be a reasonable relationship between the remedy adopted by the State and the public purpose to be furthered.

II. *Equal Protection*

 States have broad powers to enact and enforce regulations aimed at protecting the public health and safety of its citizens. *Barsky v. Board of Regents*, 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954). Any such exercise of the police power which does not restrict a fundamental right or discriminate against a suspect class will be upheld if it bears a rational relationship to a legitimate governmental interest. *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Where the state's regulation accords different treatment to persons placed by a statute into different classes, such classifications "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–562, 64 L.Ed. 989 (1920); *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971); *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141, 1152 (7th Cir. 1974), *cert. denied sub nom Chicago Bd. of Health v. Friendship Medical Center*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

Plaintiffs challenge the statutory differentiation between FSOFs and the private offices of physicians and other health care professionals[29] as a violation of their own equal protection rights under the Four-

---

28. According to one clinic administrator, the voluntary guidelines for abortion clinics published in February 1973 by the Department did not contain a corridor width requirement. (Vartanian, 6/6/80, Tr. at 386).

29. Freestanding Surgical Outpatient Facilities Differentiated From Private Practice Offices [July 30, 1979]
 .... Freestanding surgical outpatient facilities, characteristics.
 Rule 1. Characteristics of a freestanding surgical outpatient facility include, but are not limited to, the following:

teenth Amendment, distinct from the due process privacy rights of their patients. Since no "suspect class" or "fundamental right" is implicated by this classification of facilities, the State need only demonstrate that its statutory classification is reasonably related to the objective of the statute.

It is clear that the state interest in protecting health is a legitimate one and regulations toward this end are generally entitled to deference. The reason advanced by the Department for imposing a more stringent regulatory system on FSOFs than on private practice offices where similar surgical procedures may be performed is based on the extent of physician responsibility in each setting. The state's interest in protecting the welfare of its citizens is adequately assured in a private practice office by the ethical and legal constraints already imposed upon doctors, dentists and podiatrists by professional codes of conduct, the state licensing system,[30] and by tort law of professional liability. In a private practice office, the state reasonably assumes that a physician, or physicians, will have direct control over the staff and functioning of that office.

The concern expressed about the operation of FSOFs is the potential for abuse which may exist, particularly where the clinic is owned and operated by lay persons, when physicians do not control the non-surgical aspects of the facility. Where doctors are merely employed by a facility or are compensated on a per-procedure basis under contract, there may be diminished ethical and legal responsibility in the other areas of a clinic's functions, such as the hiring, training and supervision of support personnel, the acquisition of medical equipment, or in the original design of the facility.[31] This licensing and regulatory scheme, the state asserts, is intended to assure minimum standards of health and safety in such facilities. (Yerian, 6/6/80, Tr. at 411–431; 6/20/80, Tr. at 18–43).

A similar rationale for the differentiation of doctors' offices and clinics was approved in *Westchester Women's Health Organization, Inc. et al. v. Whalen*, 475 F.Supp. 734 (S.D.N.Y.1979) where a statute similar to the one at issue was upheld. The Court noted:

> Health clinics and diagnostic or treatment centers are often managed or controlled by nonmedical personnel who are not governed by the same licensing and ethical requirements as are doctors. Thus the potential for abuse does exist ... The plaintiffs contend that the state's interest is adequately protected by the requirement that abortions be per-

(a) Patient encounters with a physician, dentist, podiatrist, or other provider are primarily for the purpose of performing surgical procedures or related diagnosis, consultation, observation, and postoperative care.
(b) The owner or operator makes the facility available to other physicians, dentists, podiatrists, or providers who comprise its professional staff.
... Private practice offices, characteristics. Rule 2. Characteristics of a private practice office of a physician, dentist, podiatrist, or other provider, include, but are not limited to, the following:
(a) Patients are limited to those of the individual licensed professional maintaining and operating the office or the combined patients of individually licensed professionals practicing together in a legally constituted professional corporation, association, or partnership, and sharing office space.
(b) The office is maintained and operated by the licensed professional in accord with usual practice patterns according to the type of practice. Patient encounters in the office are

for the purpose of diagnosis and treatment and are not limited primarily to the performance of surgical procedures and related care.

**30.** For example, a physician's license to practice medicine may be suspended or revoked for "a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition which impairs, or may impair, the ability to safely and skillfully practice the health profession." M.C.L. § 333.16221(a) (M.S.A. § 14.-15 (16221) (a)).

**31.** The Administrator of two of the plaintiff clinics testified that she is responsible for running the business of the clinics (Chelian, 6/6/80, Tr. at 309), and for the hiring of the twenty non-physician employees at one clinic, and that she has the capacity to fire or discipline employees (Chelian, 12/22/80, Tr. at 5).

formed by licensed physicians. This contention is unconvincing, for the state's control over a licensed physician does not directly extend to the nonmedical management staff in control of an abortion clinic. Moreover, a diagnostic or treatment center can continue to function even though the license of its physician has been suspended or revoked, since the center can simply retain another doctor. *Id.* at 741.

Although plaintiffs argue that the licensing scheme should be invalidated because it is unnecessary to ensure safe abortions, that determination of necessity is one for the legislature to make. My function is to ascertain whether or not the State has exceeded its police power by imposing regulatory classifications which are arbitrary or unreasonable.

 Moreover, equal protection does not require that all evils of the same genus be cured or none at all. *See Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109–110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). In denying the equal protection challenge to a state regulatory scheme which applied to opticians but exempted sellers of ready-to-wear glasses, the Supreme Court in *Williamson v. Lee Optical, Inc., supra*, 348 U.S. at 489, 75 S.Ct. at 465, observed that

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different remedies. Or so the legislature may think. *Tigner v. Texas*, 310 U.S. 141 [60 S.Ct. 879, 84 L.Ed. 1124]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners*, 294 U.S. 608 [55 S.Ct. 570, 79 L.Ed. 1086]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A. F. of*

L. *v. American Sash Co.*, 335 U.S. 538 [69 S.Ct. 258, 93 L.Ed. 222]. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here.

Even though the determination of whether or not a facility is to be classified as an FSOF involves a great deal of discretion,[32] I do not find the classification so arbitrary that it must be overturned, or that there has been an abuse of discretion in identifying the plaintiff clinics as potential FSOFs. I am satisfied that the State's regulatory classification is based on differences between private practice offices and FSOFs which bear a fair and substantial relationship to the State's object of assuring adequate health care.

### III. *Selective Enforcement*

 Plaintiffs raise a claim that the regulatory scheme is being applied in a discriminatory manner to single out abortion clinics for licensure. The principle that selection enforcement of a facially neutral law violates the equal protection clause was articulated by the Supreme Court in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The city ordinance at issue in that case gave discretion to city officials to issue licenses to operate laundries in wooden buildings. Even though there was no express evidence of intent to discriminate, the statistics showing that the city had refused to issue licenses to 200 applicants of Chinese descent, while granting licenses to 80 others not of Chinese ancestry, left room for no other explanation for official motivation but impermissible discrimination on the basis of race or nationality.

Unless intent can be inferred from blatant evidence of invidious discrimination as in *Yick Wo v. Hopkins, supra*, cases generally require a showing of "intentional or

32. Dr. Yerian testified that there is a great deal of discretion in the determination of whether or not a facility fits the FSOF category. (Yerian, 6/20/80, Tr. at 15–16). It has been extremely difficult for the Department to make the determination of whether a facility is an FSOF, Dr. Yerian admitted, because there is an "extremely fine line, in many situations" between a private practice office and a freestanding surgical outpatient facility. (Yerian, 6/6/80, Tr. at 405–406).

purposeful discrimination" to prove unequal administration of a statute which violates the equal protection clause. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *Delia v. Court of Common Pleas of Cuyahoga County*, 418 F.2d 205, 206 (6th Cir. 1969). This can be established by showing (1) that the party raising the equal protection claim, compared with others similarly situated, was selectively treated; and (2) that the selective treatment was based upon impermissible considerations such as race or religion or an intent to inhibit or punish the exercise of constitutional rights, or upon purposeful discrimination aimed at a particular individual or entity. *See LeClair v. Saunders*, 627 F.2d 606, 609 (2d Cir. 1980); *Gosney v. Sonora Independent School District*, 603 F.2d 522 (5th Cir. 1979); *Southland Mall, Inc. v. Garner*, 455 F.2d 887 (6th Cir. 1972); *Moss v. Hornig*, 314 F.2d 89, 93 (2d Cir. 1963); *Glicker v. Michigan Liquor Control Commission*, 160 F.2d 96, 101 (6th Cir. 1947).

Plaintiffs allege that the Department is selectively applying the statute and regulations to abortion clinics with the impermissible motive of interfering with the exercise of the fundamental privacy rights of women who seek abortions in the first trimester of pregnancy. Of significance, plaintiffs contend, is the fact that thirty out of thirty-six facilities which are either licensed[33] or identified as potential FSOF licensees by the State are abortion clinics.[34] (P.Exs. 9, 10 and 11).

To support their claim of selective enforcement, plaintiffs also elicited testimony from Dr. Richard Yerian, the Department official who is responsible for surveying facilities to determine if they are subject to licensure as FSOFs under Public Act 368. In addition to his testimony that the determination of whether or not a facility is an FSOF is highly discretionary (see footnote 32, *supra*), Dr. Yerian explained that the process of identifying potential licensees included a search through the yellow pages in telephone directories under the heading "clinics". (Yerian, 6/20/80, Tr. at 6–9). He did not explain, however, why a number of clinics in the Detroit telephone directory yellow pages were not sent license applications by the Department, despite indications that those facilities might perform surgical procedures other than abortions. (P.Ex. 12, Yerian, 6/20/80, Tr. at 9–13).[35] Although this latter testimony raises some questions about the thoroughness of the Department's efforts to seek out clinics for licensure, I do not find plaintiffs' evidence sufficient to satisfy their burden of proof on either prong of the selective enforcement test.

The fact that thirty of the thirty-six potential licensees identified by the Department are clinics in which first-trimester abortions are performed does not in itself demonstrate that abortion clinics are being singled out for regulation. The Department contends that the numbers merely reflect the fact that there are more FSOFs being established for the purpose of performing abortions than other types of surgical procedures because of sociological and health care developments in recent years, and does not indicate any impermissible selectivity by the Department. Plaintiffs have produced no statistics to rebut that, nor have they established that other clinics similarly situated have been excluded from the Department regulatory requirements. The record does not contain enough detail about the operation and ownership of the clinics not contacted by the Department,

---

**33.** At the time of trial, seventeen facilities had been licensed as FSOFs. (Yerian, 6/6/80, Tr. at 404).

**34.** At the time of the earlier challenge to Public Act 274 and these regulations, only four of the eight licensed FSOFs were abortion clinics. *Abortion Coalition of Michigan, Inc. v. Michigan Department of Public Health, supra*, at 474.

**35.** Dr. Yerian testified that the Department did not send licensing applications to Blain Clinic ("Established 1911-Surgical-Medical"), Bloom Associates ("Oral Surgery"), Detroit Industrial Clinic, P.C., Straith Clinic ("Plastic Reconstructive & Hand Surgery"), or any of the three locations of Total Health Care of Detroit ("Comprehensive Medical-Surgical & Hospitalization Coverage"). (P.Ex. 12, Yerian, 6/20/80, Tr. at 9–13, 45–46).

which Dr. Yerian was questioned about at trial, to determine whether or not they are in fact similarly situated, i. e. that they meet the criteria for FSOFs.

Even if it had been established that the Department ignored some clinics similarly situated, the evidence does not demonstrate the impermissible intent necessary to satisfy the second prong of the selective enforcement test. Because the State has licensed six FSOFs in which surgical procedures other than abortions are performed, there is no clear pattern of selective enforcement from which to infer intent. Plaintiffs have not suggested that the Department applied the regulatory requirements more leniently for those six clinics, nor have plaintiffs submitted any other direct evidence of discriminatory motive. Based on the testimony elicited from Dr. Yerian, I could conclude that the Department's failure to contact certain clinics listed in the Detroit Yellow Pages was the result of mistake rather than design.

The evidence in this case does not support the conclusion that abortion clinics have been singled out for regulation because of an intent by state officials to hinder enjoyment of a fundamental right, or that there was any purposeful discrimination against the plaintiff clinics in particular. Plaintiffs' claim for relief on the ground of selective enforcement must be denied.

### IV. *Conclusion*

In summary, I find that two provisions of the State's regulatory scheme for freestanding surgical outpatient facilities are constitutionally invalid. Section 20821(c) of Public Act 368 (M.C.L. § 333.20821(c)) (M.S.A. § 14.15(20821(c)) and its implementing regulation, Rule 32 (R 325.3832), are void only insofar as they require an FSOF to obtain a written emergency transfer agreement with a nearby hospital as a condition to licensure. Such a delegation of power to private entities to prevent licensing without standards to guide their discretion is a violation of due process. I also find that Rule 68(8) (R 325.3868), which requires six-foot corridors in all freestanding surgical outpatient facilities, is not reasonably related to the State's interest in protecting health and safety and is therefore an invalid exercise of the State's police power.

In all other respects the statute and regulations are constitutionally sound. None of the remaining provisions, either individually or collectively, unduly burden a woman's right to seek an abortion. Based on the expert testimony at trial, I conclude that these regulations, with the two exceptions already described, are rationally related to the State's legitimate interest in assuring adequate standards of health care in facilities where outpatient surgery is performed. The statutory distinction between FSOFs and the private practice offices of doctors, dentists and podiatrists is not so arbitrary or unreasonably related to the object of the statute that it violates equal protection. Nor does the plaintiffs' evidence establish that the State is selectively enforcing the regulations in violation of the equal protection clause by impermissibly singling out abortion clinics for licensure.

An order to this effect shall issue.