**WOMEN'S MEDICAL PROFESSIONAL CORPORATION,**
**et al., Plaintiffs,**

**v.**

**J. Nick BAIRD, M.D., Defendant.**

**No. 2:03CV162.**

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 15, 2003.

whether they would be barred by the Eleventh   Amendment.

Jennifer Lynn Branch, Alphonse Adam Gerhardstein, Laufman & Gerhardstein, Cincinnati, OH, for Plaintiffs.

Dennis G Nealon, Winston M. Ford, Ohio Attorney General, Health & Human Services Section, Columbus, OH, for Defendant.

## ORDER AND OPINION

MARBLEY, District Judge.

### I. Introduction

This matter came before the Court on June 12–13, 2003, for a combined preliminary injunction hearing and bench trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). For the following reasons, the Court **GRANTS** Plaintiffs' Motion for a Permanent Injunction.

### II. Factual and Procedural Background

In October 2002, the Women's Medical Center of Dayton (the "Dayton Clinic" or the "Clinic"), an abortion clinic owned by Women's Medical Professional Corporation and Martin Haskell, M.D. (collectively, "Plaintiffs") filed an application with the Ohio Department of Health ("ODH") for a license to operate as an Ambulatory Surgical Facility ("ASF"). Ohio law defines an ASF as a facility "where outpatient surgery is routinely performed" and requires that every ASF in the state receive a license from the director of ODH. Ohio Rev.Code Ann. § 3702.30 (West 2003). ODH regulations require that all ASFs must "have a written transfer agreement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." Ohio Admin. Code § 3701-83-19(E) (2003).

On January 9, 2003, J. Nick Baird, M.D. ("Defendant" or "Director Baird"), the director of ODH, sent a notice to Plaintiffs proposing an order denying their license to operate an ASF because they did not meet the written transfer agreement requirement. Defendant's notice stated that Plaintiffs could request a hearing before Defendant within thirty days to challenge Defendant's proposed order. On the same day, Defendant issued an Order to Cease Operations to Plaintiffs, ordering them to stop operating their abortion clinic because they failed to comply with the written transfer agreement requirement. Also on January 9, Plaintiffs sought a temporary restraining order from this Court to permit them to continue operating their abortion clinic. The Court granted Plaintiffs a TRO, and the parties later voluntarily extended the TRO, which is still in effect.

Plaintiffs challenge the constitutionality of Defendant's written transfer agreement requirement as applied to the Dayton Clinic, and they now seek a permanent injunction against application of the written transfer agreement requirement with respect to the Clinic. Plaintiffs bring their suit pursuant to 42 U.S.C. § 1983, and they seek declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 64 and 28 U.S.C. §§ 2201–2202.

Plaintiff initially sought a preliminary injunction enjoining enforcement of the written transfer agreement requirement with respect to the Dayton Clinic. The parties agreed to consolidate the preliminary injunction hearing with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The Court conducted a bench trial on June 12–13, 2003.

### III. Findings of Fact

Plaintiff, Dr. Martin Haskell, has owned and operated the Women's Medical Center of Dayton (the "Clinic") since 1983. He also owns the Women's Med Center of Cincinnati and the Indianapolis Women's Center. Dr. Haskell performs abortions at all of these facilities. Dr. Haskell performs about 3,000 abortions per year at the Dayton Clinic, which is the only place in the Dayton area where elective abortions are performed. Dr. Haskell performs abortions at the clinic through the twenty-fourth week of gestation.

In October 2002, Dr. Haskell filed an application with the Ohio Department of Health ("ODH") for a license to operate

the Clinic as an Ambulatory Surgical Facility ("ASF"). The Clinic has never been a licensed ASF, either because a license was not required in the past, or because Dr. Haskell disputed whether the license requirement applied to the Clinic.

When Dr. Haskell applied for a license in October 2002, he had a written transfer agreement with Miami Valley Hospital ("Miami Valley"), which Dr. Haskell and Miami Valley had entered into on October 4, 2002. According to the agreement, Miami Valley agreed to admit patients from the Clinic who were in need of emergency medical attention or specialized care in the hospital. Although one other hospital, Kettering Memorial, is closer to the Clinic, Miami Valley is close enough to provide adequate emergency care to patients from the Clinic. The Miami Valley emergency room is the only level 1 trauma center in the Dayton area and is the largest emergency room in the area. No other hospital in the Dayton area was willing to enter into a written transfer agreement with Dr. Haskell. Dr. Haskell has a written transfer agreement with Jewish Hospital in Cincinnati for patients from Dr. Haskell's Cincinnati clinic, but Jewish Hospital was unwilling to enter into a written transfer agreement with Dr. Haskell for his Dayton Clinic.

On November 19, 2002, Miami Valley sent Dr. Haskell a letter informing him that it was rescinding its written transfer agreement with the Clinic that they had entered in October. The letter stated that the agreement would be terminated in thirty days pursuant to the terms of the agreement. Miami Valley's vice president of operations signed the letter, which provided no explanation for the hospital's decision to terminate the written transfer agreement. The letter stated that although the written transfer agreement would be terminated, "Of course, the Miami Valley Hospital Emergency and Trauma Center will be available to any of your patients that have an emergency medical condition."

In fact, Miami Valley decided to rescind its written transfer agreement with the Clinic at the urging of Miami Valley board member Dr. William Stalter. Premier Health Care owns both Miami Valley and Good Samaritan Hospital, which is a Catholic hospital. When Premier Health Care purchased Miami Valley, Miami Valley agreed not to perform abortions, promote abortion procedures, or do anything to embarrass its sister Catholic hospital. When Dr. Stalter learned of the written transfer agreement between Miami Valley and the Clinic, he telephoned the head of Premier Health Care and urged that the agreement be rescinded. Several days later, Miami Valley sent Dr. Haskell the letter rescinding the written transfer agreement with the Clinic.

On December 20, 2002, counsel for Dr. Haskell sent a letter to ODH informing ODH that the Clinic's written transfer agreement had been rescinded. Dr. Haskell requested a waiver of Ohio Administrative Code section 3701–83–19(E), which requires all ambulatory surgical facilities to have a written transfer agreement. Dr. Haskell explained that he had been unable to receive a written transfer agreement from any hospital in the Dayton area. Dr. Haskell also explained that he had a relationship with a five-member obstetrics-gynecology group that provided back-up medical services for the Clinic. According to Dr. Haskell's letter, at least one member of the five-member group was on call twenty-four hours a day, and those doctors had admitting privileges at local hospitals. Dr. Haskell's counsel asked ODH to contact her should it need any additional information in considering his waiver request.

Dr. Haskell heard no response from ODH until January 9, 2003. On that day, Director Baird, the director of ODH, sent a notice to Plaintiffs proposing an order denying their license to operate an ASF because they did not meet the written transfer agreement requirement of Ohio Administrative Code section 3701–83–19(E) (2003). Director Baird found that Plaintiffs met all the other requirements for an ASF license. On January 9, Director Baird also issued an Order to Cease Operations to Plaintiffs, ordering them to stop operating their abortion clinic because they failed to comply with the written transfer agreement requirement. Director Baird issued his Order to Cease Operations pursuant to Ohio Revised Code section 3702.32, which authorizes him to order an unlicensed ASF to cease operations. Section 3702.32 was passed in September 2002. Finally, on January 9, Director Baird also sent a letter to Dr. Haskell's attorney denying Dr. Haskell's request for a waiver of the written transfer agreement requirement. Director Baird stated that he believed that Dr. Haskell's agreement with an unidentified five-person obstetrics-gynecology group provided insufficient protection for the safety of Dr. Haskell's patients. Further, Director Baird's letter stated that his denial of a waiver was final and not appealable.

Director Baird acknowledges that he may grant a waiver to an ASF if the license requirement at issue poses an undue hardship to the ASF and if the "waiver will not jeopardize the health and safety of any patient." Ohio Admin. Code § 3701–83–14(D)(2). Director Baird admits that the written transfer agreement requirement poses an undue hardship to the Clinic. He further admits that a hospital is free to deny the Clinic a written transfer agreement for any reason whatsoever, including political reasons.

Director Baird contends that granting a waiver to the Clinic would jeopardize the health and safety of the Clinic's patients. But in processing Dr. Haskell's application for a waiver, ODH did not follow its normal procedures for determining an ASF's eligibility for a waiver. Rather, Director Baird denied the Clinic a waiver solely on the grounds that the Clinic lacked a written transfer agreement. No one at ODH gave complete consideration to the alternative avenues of care available to patients at the Clinic besides via a written transfer agreement.

Russell Roeder, the acting chief of ODH's Bureau of Regulatory Compliance and an ODH employee for about thirty-two years, testified that he would normally be involved with processing requests for waivers of ASF licensing requirements. In this case, however, he was not asked to assist in processing Dr. Haskell's waiver request. Normally, Mr. Roeder would consider all the information provided by an applicant for a waiver and seek to verify whether the applicant presents an adequate alternative to the normal licensing requirement.

In this case, however, Dr. Haskell's request for a waiver was at all times routed through ODH's legal department. Director Baird himself received hundreds of letters from Ohio citizens asking him to close Dr. Haskell's Clinic. Many of these letters were also sent to the Ohio governor's office. These letters generally asked Director Baird to uphold state law and deny the Clinic any waivers to the ASF licensing requirements.

Furthermore, Director Baird received a letter from Ohio state senator Jim Jordan urging him to deny any waiver requests for the Clinic. Senator Jordan reminded Director Baird that the state had recently passed new legislation that gave Director Baird the authority to order an ASF to

cease operations if it failed to obtain a state license. Director Baird wrote a response to Senator Jordan, which states that "We are conferring with legal counsel to determine the options available to us subsequent to December 20th." December 20 was the date Miami Valley's written transfer agreement with the Clinic was terminated.

In addition to Director Baird's correspondence with Senator Jordan, Jodi Govern, ODH's general counsel, repeatedly corresponded with several individuals who opposed granting the Clinic a license or a waiver. Ms. Govern kept these individuals informed of the status of the Clinic's application and the licenses of other abortion clinics. At no time, however, did anyone from ODH contact Dr. Haskell or his counsel to seek additional information concerning his request for a waiver. Director Baird, Ms. Govern, and Mr. Roeder all agree that ODH is not in the business of shutting down ASFs; rather, ODH is obligated to ensure that all ASFs provide safe care to their patients. No one at ODH ever investigated Dr. Haskell's assurances that Miami Valley would admit his patients despite the lack of a written transfer agreement, that he has always been able to admit patients to hospitals in emergency situations, or that his five-person back-up group could provide adequate emergency care to his patients.

On cross-examination at trial, Director Baird essentially admitted that he denied the Clinic a license or a waiver solely because it lacked a written transfer agreement and that he did not consider additional assurances of patient safety in detail. Director Baird testified as follows:

Q. Isn't this all about getting emergency patients into a hospital?

A. There was not a transfer agreement and that's what the rule requires. And in my opinion there was a potential safety issue regarding patients and that's why I denied the waiver.

Q. Right. But wasn't this about getting those patients into the hospital if they needed care?

A. No. This was about my upholding the law that I am required to do under the position that I have as director of the Department of Health.

These answers essentially mimic the language in the hundreds of letters Director Baird received from Ohio citizens and from Senator Jordan. There is no evidence that Director Baird ever seriously considered whether Dr. Haskell had alternative procedures in place that would provide the same level of safety and care to his patients as a written transfer agreement.

In fact, the procedures that Dr. Haskell has in place do assure the same degree of safety to his patients as would a written transfer agreement. Although a written transfer agreement is one way to formalize a hospital's willingness to accept transfer patients from an ASF, a written transfer agreement does not ensure optimum care. Ohio regulations that require a written transfer agreement do not establish any guidelines for the terms that such an agreement must contain. In fact, many written transfer agreements do not provide patients with any kind of priority over other patients who present at the hospital's emergency room. Furthermore, written transfer agreements do not even guarantee that a hospital will admit patients from an ASF because the hospital may condition the agreement upon availability in the emergency room.

In the Dayton area, hospital emergency rooms sometimes become too busy for any additional patients to be treated. Such situations are governed by the Greater Dayton Area Hospital Association's ("GDAHA") Policy Statement for Temporary Rerouting of Emergency Patients.

When a hospital goes into rerouting status, patients are not taken to that emergency room even if the patient is coming from an ASF with a written transfer agreement with that hospital.

As a practical matter, doctors in the Miami Valley emergency department and at other emergency departments are unaware of written transfer agreements. The care those doctors provide to patients in the emergency room does not depend on the existence of a written transfer agreement. Optimum care is generally ensured when a doctor with knowledge of a patient's condition admits the patient to a hospital. A doctor must have admitting privileges with a hospital in order to admit patients. Although Ohio regulations require a written transfer agreement, which does not necessarily ensure optimum care, Ohio regulations do not require that an ASF have a doctor with hospital admitting privileges on its staff.

All of the expert witnesses who testified at trial agreed that written transfer agreements do not ensure optimum patient care. Dr. Norman Schneiderman, who testified for Dr. Haskell, has been an emergency physician at Miami Valley for twenty-five years. From 1990 through 2000, he served as the medical director of the emergency department at Miami Valley, and he recently completed a two-year term as the hospital's chief of staff. According to Dr. Schneiderman, optimum patient care is provided when a patient is admitted to the hospital under the care of an admitting physician who is familiar with the patient's condition. A written transfer agreement alone does not ensure the same degree of continuing care. Furthermore, when Miami Valley is on rerouting status, patients coming from ASFs with written transfer agreements are not necessarily accommodated at the hospital. Furthermore, patients from ASFs with written transfer agreements are not afforded priority of care over patients who simply present at the emergency room unaccompanied by a doctor or a written transfer agreement.

Although Defendant's expert witness, Dr. Stephen House, emphasized the need for written transfer agreements, he agreed that they do not ensure optimum care. Dr. House is the director of clinical management at Kettering Medical Center. Dr. House noted that written transfer agreements are important because they are required for state licensing and for accreditation by various accrediting bodies. Ohio ASF regulations, however, do not require that ASFs be accredited by any accrediting body. Although Dr. House testified that written transfer agreements help to ensure continuing care for ASF patients, he admitted that especially when a hospital is in rerouting status, having a doctor with admitting privileges at a hospital may be the only way to guarantee admission of a patient at that hospital.

Dr. William Stalter also testified as an expert witness for Defendant. Dr. Stalter has been on obstetrician-gynecologist since 1971. He is currently retired, but continues to work as the medical director of Miami Valley Women's Center, which provides pregnant women with counseling and generally discourages them from having abortions. On direct examination, Dr. Stalter testified that written transfer agreements ensure optimum care even when a hospital is in rerouting status. But on cross examination, Dr. Stalter admitted that Dr. Schneiderman would be more knowledgeable about emergency room procedures because Dr. Stalter is not an emergency room physician. Furthermore, Dr. Stalter conceded that Miami Valley's standard written transfer agreement does not guarantee that patients will be admitted to the hospital if it is in rerouting status. Dr. Stalter admitted that he was not an expert on written transfer agree-

ments or emergency room procedures. Although he testified on direct examination that written transfer agreements are kept on file in emergency rooms for physician reference, he admitted on cross examination that he did not know if physicians in the Miami Valley emergency department had access to the hospital's written transfer agreements.

All emergency rooms in the Dayton area are subject to the requirements of the Federal Emergency Medical Treatment and Active Labor Act ("EMTALA"). According to EMTALA, all hospital emergency rooms must treat any patient who presents at the emergency room. The hospital is not required to admit the patient for continuing care, but must at least stabilize the patient's condition before transferring the patient to another hospital. The requirements of EMTALA do not ensure optimum care for patients, but they do at least ensure that any patient who presents at an emergency room will receive treatment.

During the more than twenty years that Dr. Haskell's Clinic has been in operation, only a handful of medical emergencies have required a patient to be immediately transferred to a hospital. About once every two years, a less urgent emergency requires that a patient be transferred to a hospital within a matter of hours. Dr. Haskell's emergency procedures have always provided adequate care for these patients. Dr. Haskell maintains an emergency protocol and trains his staff for emergencies. Dr. Haskell's back-up group has successfully provided emergency services for the Clinic's patients, ensuring their successful transfer to local hospitals. In the few rare occasions where immediate transfer to a hospital was required, Dr. Haskell has successfully relied on Dayton's 911 service. Although no witness testified that the availability of 911 alone can ensure optimum patient care, Defendant presented no evidence that other methods of emergency transportation are readily available for the kinds of emergencies that require immediate transfer to a hospital.

Since the initiation of this lawsuit, Dr. Haskell's original five-member back-up group has withdrawn from providing back-up services for the Clinic for fear that their names would become public in the course of this lawsuit. Some of the members of that group did not want their names associated with the Clinic for fear of retaliation from certain constituencies. Since that withdrawal, Dr. Haskell has been able to retain another similar group to provide back-up services for the Clinic. He remains unable to disclose the names of the doctors in that back-up group.

## IV. Analysis

### A. Defendant's Overarching Arguments

■ As a threshold matter, the Court must consider several of Defendant's overarching arguments. Defendant argues that Plaintiffs' Complaint before this Court is moot because the five-person back-up group that Dr. Haskell once relied upon has withdrawn, and therefore, the facts that Director Baird considered in evaluating Plaintiffs' request for a waiver have changed. The Court fails to see how this change in circumstances makes Plaintiffs' Complaint moot. Plaintiffs continue to seek a license or a waiver of the written transfer agreement requirement so that Dr. Haskell may continue operating his Dayton Clinic. Director Baird continues to refuse to grant Plaintiffs a license or a waiver, and his order to Plaintiffs to cease operating the Clinic still stands. Therefore, Plaintiffs' Complaint is not moot because there is a continuing controversy between the parties. *See N. Am. Natural Res., Inc. v. Strand,* 252 F.3d 808, 812 (6th Cir.2001) (noting that the question of mootness deals with "whether an actual

case or controversy exists for adjudication").

■ Next, although Defendant does not challenge Plaintiffs' standing to bring their Complaint, the Court notes that Dr. Haskell has standing to assert not only his own rights, but the rights of his patients who seek abortions. *See Singleton v. Wulff,* 428 U.S. 106, 118, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1396 (6th Cir.1987) (citing *Singleton* ); *Birth Control Ctrs., Inc. v. Reizen,* 508 F.Supp. 1366, 1369 (E.D.Mich.1981); *see also Tesmer v. Granholm,* 333 F.3d 683, 691 (6th Cir.2003) (en banc) (relying on *Singleton* for an analysis of third-party standing).

■ Defendant contends that this Court lacks authority or jurisdiction to review the application of ODH's written transfer agreement requirement to Plaintiffs because the Court must not "sit as a super-legislature to second-guess legislative factual conclusions when there is any basis at all for reaching them." *Operation Badlaw, Inc. v. Licking County Gen. Health Dist. Bd. of Health,* 866 F.Supp. 1059, 1066 (S.D.Ohio 1992).[1] Plaintiffs argue that the cases Defendant cites for this proposition all deal with facial attacks to statutes, not as-applied constitutional challenges. Both parties miss the essential distinction between the law at issue in *Operation Badlaw* and the regulation at issue in this case. In *Operation Badlaw,* the court applied the rational basis test to a law governing smoking, which is not a fundamental right.

*See* 866 F.Supp. at 1064–66. The rational basis test, however, is not used to assess the constitutionality of regulations that affect fundamental rights. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (applying rational basis test to determine constitutionality of an economic regulation and noting that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in *areas that neither affect fundamental rights* nor proceed along suspect lines") (emphasis added).

Plaintiffs claim that the written transfer agreement requirement, as applied to Dr. Haskell's Dayton Clinic, unduly burdens a woman's ability to choose to have an abortion. A woman's right to an abortion, which is subject to certain restrictions, is a fundamental right encompassed in the substantive portion of the Due Process Clause of the Fourteenth Amendment, and is not governed by the rational basis test applied in *Operation Badlaw. See Roe v. Wade,* 410 U.S. 113, 152–55, 93 S.Ct. 705, 35 L.Ed.2d 147 (holding that a woman's right to choose an abortion is a fundamental right encompassed by the fundamental right of privacy and that regulations of abortion must be evaluated according to strict scrutiny); *see also Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 846, 874–78, 112 S.Ct. 2791, 120 L.Ed.2d 674 (plurality opinion) (reaffirming *Roe's* holding that a woman's right to an abortion is a fundamental right protected under the Due Process Clause of the Fourteenth Amendment, and embracing

---

1. On several occasions, Defendant makes much of the fact that the Ohio General Assembly has decided that written transfer agreements must be required for ASFs, and that the Court must not disturb that decision. Although of little consequence to the Court's decision, the Court notes that the Ohio General Assembly did not promulgate the written transfer agreement requirement. Rather, written transfer agreements are required by an administrative regulation that governs licensing of ASFs. Although administrative regulations are authorized by the General Assembly, they are in fact written by the Director. *See* Ohio Rev.Code Ann. § 3702.12.

an "undue burden" standard for evaluating abortion regulations).

In addition to claiming that the written transfer agreement requirement poses an undue burden to women seeking abortions, Plaintiffs also claim that the process through which Dr. Haskell was denied an ASF license and a waiver of the written transfer agreement requirement violated his right to procedural due process. Analysis of Dr. Haskell's procedural due process claim does not rely on either the rational basis test or strict scrutiny, but instead follows a different analysis outlined below. Therefore, Defendant's argument that the Court must not sit as a superlegislature is also inapplicable to Dr. Haskell's procedural due process claim.

Finally, Defendant argues that this is not an abortion case, and that the Court should disregard the fact that Dr. Haskell operates an abortion clinic, as opposed to some other form of ASF. Defendant is partly correct that this is not an abortion case to the extent that the outcome of the case is governed in part by Dr. Haskell's procedural due process claim. Nevertheless, the fact that Dr. Haskell operates an abortion clinic is of crucial importance because Ohio's ability to regulate abortions is limited to certain compelling or legitimate state interests. *See Casey,* 505 U.S. at 846, 112 S.Ct. 2791. Because Plaintiffs make an as-applied challenge to the written transfer agreement requirement, the Court cannot ignore the fact that the regulation is being applied to an abortion clinic and therefore affects abortion rights.

## B. Permanent Injunctive Relief

Plaintiffs are entitled to a permanent injunction against enforcement of the ODH's written transfer agreement requirement if the Court finds that the requirement as applied to Plaintiffs violates the Constitution and Plaintiffs show that they will suffer "continuing irreparable injury" for which there is no adequate reme-

dy at law. *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1067 (6th Cir.1998); *see also Allee v. Medrano,* 416 U.S. 802, 814, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (noting that "irreparable injury" is the "traditional prerequisite to obtaining an injunction").

### 1. Irreparable Harm

Before the Court may grant injunctive relief, Plaintiffs must demonstrate that they will suffer irreparable harm for which there is no adequate remedy at law if the Court does not issue an injunction. Dr. Haskell claims that Director Baird's application of Ohio's written transfer agreement requirement to his Dayton Clinic violates the Due Process Clause of the Fourteenth Amendment. In particular, he asserts that application of the transfer agreement requirement creates an undue burden for women seeking an abortion and that it violates his right to procedural due process.

In considering as-applied challenges to state laws, the Court may "strike down applications of constitutional statutes which [it finds] to be unconstitutionally applied," thereby causing irreparable harm. *Allee,* 416 U.S. at 815, 94 S.Ct. 2191 (quoting *Cameron v. Johnson,* 390 U.S. 611, 620, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968)). Dr. Haskell demonstrates two forms of irreparable harm. First, if Director Baird's order to Dr. Haskell to cease operating the Dayton Clinic stands, women in Dayton will no longer have access to abortion services in the Dayton area. This constitutes irreparable harm because there is no remedy available at law by which women in the Dayton area could be compensated for the unavailability of abortion services.

Second, denial of Dr. Haskell's license to operate the Clinic creates irreparable injury to Dr. Haskell because it prevents him from continuing an ongoing business. If

ODH were permitted to shut down Dr. Haskell's Dayton Clinic, there would be no remedy available at law by which Dr. Haskell could recoup the business he would lose by his inability to continue operating the Clinic. *See Second City Music, Inc. v. City of Chicago,* 333 F.3d 846, 849–50 (7th Cir.2003) (recognizing that denial of a business license may cause irreparable injury, but upholding licensing scheme where the plaintiff failed to show that it was unable to obtain a license).

### 2. Constitutional Violation

The Court now turns to the question of whether application of Ohio's written transfer agreement requirement to the Clinic violates the Constitution. The Court will consider both whether the requirement, as applied, violates the substantive aspect of the Due Process Clause by creating an undue burden on women seeking abortions, and whether the requirement, as applied, violates the procedural aspect of the Due Process Clause by denying Dr. Haskell due process when he applied for a license and waiver.

### (a) Undue Burden

■ The Supreme Court has held that women have a fundamental right to privacy that includes the right to choose to have an abortion, subject to certain restrictions. *See Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). This right is encompassed by the substantive liberty aspect of the Due Process Clause of the Fourteenth Amendment. *See Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (reaffirming *Roe's* basic holding); *Roe,* 410 U.S. at 153, 93 S.Ct. 705. Generally, the state has a legitimate interest in protecting the health of women who seek abortions, and a state may restrict abortions after fetal viability. *Casey,* 505

U.S. at 846, 112 S.Ct. 2791. In a plurality opinion, the Court in *Casey* embraced an "undue burden" standard for determining whether certain regulations infringe upon a woman's right to choose an abortion, and lower courts have subsequently applied that standard. *Id.* at 878, 112 S.Ct. 2791 (plurality opinion [2]); *Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 192–93 (6th Cir.1997) (applying *Casey's* undue burden standard to strike down an Ohio law restricting abortions). The Court explained that an "undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey,* 505 U.S. at 878, 112 S.Ct. 2791. "Regulations designed to foster the health of a woman seeking an abortion are valid if they do not constitute an undue burden." *Id.*

In *Casey,* the Court applied the undue burden standard to uphold a state law requiring a twenty-four-hour waiting period before a woman receives an abortion. *Id.* at 881–87, 112 S.Ct. 2791. Under the statute at issue in *Casey,* a woman is required to meet with a physician or a qualified nonphysician at least twenty-four hours before an abortion to receive certain information about the procedure to enable her to give her informed consent to the abortion. In effect, the statute requires that women make two trips to the doctor to receive an abortion. *Id.* at 881, 112 S.Ct. 2791. The Court found that the statute on its face does not unduly burden a woman's right to an abortion because a twenty-four-hour delay furthers the state's interest in ensuring that women make informed decisions about whether to receive an abortion but does not place a substan-

---

**2.** The portion of the Court's opinion adopting the undue burden standard is a plurality opinion, but a majority of the Court joined the portion of the opinion reaffirming *Roe's* basic holdings.

tial obstacle in the way of a woman's right to choose an abortion. *Id.* at 885, 112 S.Ct. 2791. The Court also upheld the statute as applied despite the fact that it might increase the cost of abortions and require women to make two trips to an abortion clinic, which may entail harassment by abortion protesters. *Id.* at 886, 112 S.Ct. 2791.

The Court has also held that a state may require that only licensed physicians perform abortions. *See Mazurek v. Armstrong*, 520 U.S. 968, 974–75, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). In *Mazurek*, the Court noted that the Montana statute at issue would not require any women "to travel to a different facility than was previously available" because the only nonphysician who was performing abortions before enactment of the statute practiced with physicians. *Id.* at 974, 117 S.Ct. 1865. Those physicians would be able to continue operating their abortion clinic. *Id.* The Court emphasized that restricting performance of abortions to physicians was the kind of regulation that legitimately serves to protect the health of women without creating a "substantial obstacle" to abortion. *Id.* at 974–75, 117 S.Ct. 1865.

Plaintiffs challenge the constitutionality of the written transfer agreement requirement only as applied to them, not on its face. Therefore, the Court need only consider whether the written transfer agreement requirement poses an undue burden as applied to Plaintiffs' "particular situation." *Women's Med. Prof'l Corp.*, 130 F.3d at 193. In Plaintiffs' situation, Ohio's written transfer agreement requirement serves to shut down the Dayton Clinic completely, not merely increase the cost of receiving an abortion at the Clinic. Dr. Haskell has tried repeatedly to obtain a written transfer agreement from Dayton hospitals, but none of them is willing to enter a written transfer agreement with him.

The Court recognizes that the written transfer agreement requirement serves the legitimate purpose of furthering the safety of patients who are treated at ASFs. Indeed, written transfer agreements serve as a convenient method for ODH to ensure that ASFs have some minimum provisions in place for transfer of patients in emergencies. But the Court finds that written transfer agreements only ensure the minimum level of care, that is, that patients will be able to be admitted to some hospital near the ASF. They do not ensure optimum care. Rather, the testimony of all the doctors at trial revealed that optimum care is only provided when a doctor with admitting privileges admits a patient to the hospital and sees to the patient's care. Written transfer agreements do not necessarily ensure that a patient's current information will be transferred to a hospital. Furthermore, written transfer agreements need not even guarantee that patients will be admitted to the hospital. In some circumstances, patients may be rerouted to other hospitals despite the existence of a written transfer agreement.

Director Baird has no control over whether hospitals enter written transfer agreements with abortion clinics. Therefore, hospitals in Ohio are able to dictate whether abortion clinics are able to meet the state's requirements for licensure as an ASF. As applied to this case, this delegation of authority creates an undue burden to a woman's ability to choose an abortion because no Dayton hospital is willing to enter a written transfer agreement with Dr. Haskell.

Only a handful of courts have considered the restriction that a written transfer agreement requirement places on an abortion clinic. Those courts, however, have

found that such a requirement constitutes an impermissible delegation of authority to third parties where the hospitals may block an abortion clinic's licensure for any reason or no reason at all. In *Birth Control Centers, Inc. v. Reizen*, 508 F.Supp. 1366, 1374 (E.D.Mich.1981), *aff'd in part and vacated on other grounds*, 743 F.2d 352 (6th Cir.1984),[3] the court ruled that a written transfer agreement requirement was unconstitutional because it delegated "a licensing function to private entities without standards to guide their discretion." Because hospitals could deny written transfer agreements for any reason, the court concluded that "[s]uch an impermissible delegation without standards or safeguards to protect against unfairness, arbitrariness or favoritism is void for lack of due process." *Id.* at 1375. Likewise, the court in *Hallmark Clinic v. North Carolina Department of Human Resources*, 380 F.Supp. 1153, 1159 (E.D.N.C. 1974) (three-judge court),[4] found that a transfer agreement requirement gave "hospitals the arbitrary power to veto the performance of abortions for any reason or no reason at all." Emphasizing the fact that the state had not established any standards for hospitals to follow in granting transfer agreements, the court held that the transfer agreement requirement was unconstitutional because it gave hospitals the ability to prevent the performance of abortions for no reason at all, something the state itself could not do. *Id.* at 1158–59.

Counsel for Director Baird do not contest the idea that vesting hospitals with unbridled authority to veto the performance of abortions would be unconstitutional. Director Baird argues instead that Ohio's written transfer agreement requirement is constitutional because he is given the discretion to grant waivers or variances of the requirement. Director Baird cites three cases for the proposition that where waivers or variances are available, written transfer agreement requirements for abortion clinics are permissible. None of these cases, however, holds as such.

First, in *Westchester Women's Health Organization, Inc. v. Whalen*, 475 F.Supp. 734, 740–41 (S.D.N.Y.1979), the court upheld certain abortion regulations on the grounds that they did not unduly interfere with a woman's right to choose an abortion. The statute in *Whalen* did not require written transfer agreements, but only set certain operating and construction standards for health facilities. *See id.* at 736, 740–41. Second, in *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1379 (8th Cir.1989), the court upheld a statute requiring abortion physicians to have surgical privileges at a hospital. The court did not rest its decision on the availability of waivers and variances. Rather, the court distinguished the decisions in *Reizen* and *Hallmark Clinic*, noting that in those cases statutes were ruled unconstitutional for delegating licensing decisions to third parties without standards. *Id.* at 1382. The court found that the statute at issue in *Webster* was not an attempt to regulate the licensing of abortion clinics, but rather to regulate the qualifications of physicians who perform abortions. *Id.* Unlike *Webster*, the Ohio regulation at issue in this case is an ASF licensing regulation more like the ones in *Reizen* and *Hallmark Clinic* than the one

---

**3.** The district court's ruling regarding the constitutionality of the written transfer agreement requirement was not appealed.

**4.** The defendants in *Hallmark Clinic* did not appeal the three-judge district court's decision, although the Fourth Circuit affirmed the district court's denial of attorney fees. *See Hallmark Clinic v. N.C. Dep't of Human Res.*, 519 F.2d 1315 (4th Cir.1975).

in *Webster* that sought to regulate the qualifications of abortion physicians.

Third, in *Greenville Women's Clinic v. Commissioner, South Carolina Department of Health and Environmental Control*, 317 F.3d 357, 361–63 (4th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1908, 155 L.Ed.2d 843 (2003), the court rejected a facial challenge to a statute that requires abortion clinic doctors to maintain certain admitting privileges at local hospitals. The court first found that there was no evidence that any of the plaintiffs had been unable to maintain the required admitting privileges. *Id.* at 362. Second, the court emphasized that the statute required that public hospitals not "act unreasonably, arbitrarily, capriciously, or discriminatorily in granting or denying admitting privileges." *Id.* at 362. Therefore, given the benefit of ensuring admitting privileges and the remote possibility that a hospital could exercise a veto over a woman's right to choose an abortion, the court refused to sustain a facial challenge to the statute. *Id.* at 363. The court noted the availability of waivers and exceptions under the statute. *Id.*

*Greenville Women's Clinic* is different from the case *sub judice* for two reasons. First, Dr. Haskell makes an as-applied challenge to Ohio's written transfer agreement requirement, not a facial attack. Unlike in *Greenville Women's Clinic*, where the plaintiffs had been able to meet the requirements of the statute, Dr. Haskell has demonstrated that he is unable to obtain a written transfer agreement. Second, the statute in *Greenville Women's Clinic* provided for certain standards whereby public hospitals could not arbitrarily or unreasonably deny an abortion clinic the statutorily required hospital privileges. The Ohio regulation in this case contains no such standards. Director Baird testified that a hospital may deny an abortion clinic a written transfer agree-

ment for any reason at all, including political reasons.

Counsel for Director Baird argue in their brief that "[c]learly, had Plaintiffs identified the names of any physicians with admitting privileges and the hospitals where such privileges were held, Director Baird would have *considered* a waiver or variance." Def.'s Post–Trial Br. at 11 (emphasis added). This is precisely the reason that Director Baird's ability to grant a waiver does *not* save the written transfer agreement requirement as applied to Dr. Haskell's Dayton Clinic. Director Baird cannot state with certainty upon what conditions he would grant a waiver. Instead, waivers are granted solely at his discretion. True, he would consider any information that Plaintiffs provide him, but he retains full discretion to grant or deny the waiver.

Counsel for Director Baird also argue that the hundreds of letters that Director Baird received urging him to deny Dr. Haskell's waiver request prove that he, not hospitals, retains ultimate authority to grant or deny Plaintiffs' ASF license. If this is true, the letters also demonstrate that ODH may consider factors beyond the safety of patients in determining whether to grant or deny a waiver request.

Ohio Administrative Code section 3701–83–14(D) provides that

> The granting of a ... waiver is a discretionary act by the director based upon documentation: ... (2) In the case of a waiver request, as to how the requirement is an undue hardship to the [applicant] and why the waiver will not jeopardize the health and safety of any patient.

Director Baird admits that the written transfer agreement requirement poses an undue hardship to Plaintiffs because Dr. Haskell is unable to obtain such an agreement from any Dayton hospital. Director

Baird testified, however, that in his opinion, granting Plaintiffs a waiver would jeopardize the health and safety of Dr. Haskell's patients. But the administrative code establishes no standards governing Director Baird's ability to grant or deny waiver requests. Therefore, not only are there no established standards to regulate whether hospitals will grant Dr. Haskell a written transfer agreement, there are no standards to regulate whether Director Baird will grant him a waiver or variance.

This system, as applied to Dr. Haskell's Dayton Clinic, creates an undue burden on women in the Dayton area who seek abortions. If the regulations required Dr. Haskell to hire doctors with certain hospital privileges, the Court could calculate the additional cost required and determine whether the increased cost for an abortion created an undue burden on a woman's right to choose an abortion. But in this case, the regulations serve to shut down completely Dr. Haskell's Dayton Clinic. The only way he can ensure licensure of the Clinic is by obtaining a written transfer agreement with a local hospital. Dr. Haskell, however, has been completely unable to obtain such an agreement. This is not a case where additional cost is required for licensure; rather, this is a case where licensure of the Clinic is completely foreclosed by the written transfer agreement requirement.

Counsel for Director Baird cite three cases for the proposition that Ohio's written transfer agreement requirement does not create an undue burden on the right of women in the Dayton area to choose an abortion. The regulations upheld in these cases are distinguishable from regulation presently before the Court. First, in *A Woman's Choice–East Side Women's Clinic v. Newman*, 305 F.3d 684, 691–92 (7th Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1273, 154 L.Ed.2d 1026 (2003), the court upheld an Indiana statute that essentially required a woman seeking an abortion to make two trips to an abortion clinic. The court found that the statute was substantially identical to the twenty-four-hour waiting period statute upheld in *Casey* and concluded that requiring women to make two trips to an abortion clinic did not unduly burden her ability to choose to have an abortion. *Id.* at 691. *Newman* does not consider a regulation that, as applied, serves to close completely an abortion clinic, like the Ohio regulation at issue in this case.

Second, in *Fargo Women's Health Organization v. Schafer*, 18 F.3d 526, 532–34 (8th Cir.1994), the court upheld another statute similar to the twenty-four-hour waiting period statute in *Casey*. In *Schafer*, the court considered a statute that required women seeking an abortion to be provided with certain information at least twenty-four hours before receiving an abortion. *Id.* at 527. The court concluded that the burden imposed by the statute was even less than in *Casey* because the information could be provided by telephone, therefore requiring the patient to travel to the abortion clinic only one time. *Id.* at 533. The court noted that "[a]lthough the distance a woman must travel to obtain an abortion may be a factor in obtaining an abortion, it is not a result of the state regulation." *Id.* In the case *sub judice*, however, Ohio's written transfer agreement requirement, as applied to Plaintiffs, would act to shut down completely Dr. Haskell's Dayton Clinic. Therefore, the 3,000 patients who annually seek services at the Clinic would be forced to travel to other cities to receive an abortion.

Third, in *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170–71 (4th Cir. 2000), the court upheld certain abortion regulations against a facial attack, including a written transfer agreement requirement, because they did not create an un-

due burden on a woman's right to choose an abortion. In *Bryant,* the district court had found that the regulations at issue would cause abortions at the plaintiffs' clinics to increase in cost between $23 and $368. *Id.* at 162. The court in *Bryant* recognized that the increased costs for one of the clinics would probably be prohibitive and would force that clinic to close. *Id.* at 165. In the case *sub judice,* Director Baird has relied on the Ohio written transfer agreement requirement to order Dr. Haskell to cease operating the Dayton Clinic. Dr. Haskell is not forced to close the Clinic due to the prohibitive costs of retrofitting the Clinic as in *Bryant,* but rather, the state is attempting to order him to close the clinic because he has been unable to comply with a requirement for which no additional cost could ensure compliance. Were the state permitted to enforce this regulation against Dr. Haskell, women in Dayton would not only face additional costs for abortions, but they would be completely foreclosed from receiving abortions in the Dayton area.

In conclusion, the Court finds that application of the written transfer agreement requirement of Ohio Administrative Code section 3701–83–19(E) to Dr. Haskell's Dayton clinic creates a substantial obstacle to the ability of women in the Dayton area to choose an abortion. Application of the written transfer agreement requirement and application of the waiver provision of Ohio Administrative Code section 3701–83–14(D)(2) would serve to shut down completely Dr. Haskell's Dayton clinic, which serves 3,000 women each year. Without establishing standards for granting or denying written transfer agreements or for granting or denying waivers, the regulations prevent Dr. Haskell from a meaningful opportunity to seek an ASF license for the Clinic.

**(b) Procedural Due Process**

■ The Court now turns to Dr. Haskell's claim that Director Baird's denial of an ASF license for the Dayton Clinic and denial of his request for a waiver deprived him of his right to procedural due process as guaranteed by the Due Process Clause of the Fourteenth Amendment. To establish a procedural due process claim, Plaintiffs must establish the following three elements:

(1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest.

*Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir.1999). Because Plaintiffs bring their procedural due process claim pursuant to 42 U.S.C. § 1983, they must demonstrate that "state remedies for redressing the wrong are inadequate." *Id.* (quoting *Vicory v. Walton,* 721 F.2d 1062, 1066 (6th Cir.1983)).

First, Dr. Haskell has a property interest in his Dayton Clinic. Property interests protected by the Due Process Clause are not defined in the Constitution; instead, they are defined by independent sources of law, such as state law. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Counsel for Director Baird argue that Dr. Haskell lacks a liberty or property interest in an ASF license because he has never had a license before. But Dr. Haskell has operated his Dayton Clinic for twenty years. Until recently, he has not been required to have a license to operate the Clinic. Because Dr. Haskell has been permitted to operate his Clinic

for twenty years without a license, he has established a property right in the Clinic, which is an ongoing business. *See Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir.1983) ("When governmental institutions regulate careers or occupations in the public interest through the licensing process, their definitions of rights in a license ... may give rise to competition rights and constraints that define property interests."); *Iheama v. Mahoning County Mental Health Bd.,* 115 F.Supp.2d 866, 871 (N.D.Ohio 2000) (citing *Wilkerson* and finding that group home operators had property interest in continued operation of their businesses).

Second, Dr. Haskell will be deprived of his property interest in the Dayton Clinic if Director Baird's order to cease operating the Clinic remains in force.

Third, the Court concludes that Dr. Haskell has not been afforded adequate procedural rights prior to Ohio's deprivation of his property interest in the Dayton Clinic. The written transfer agreement requirement provides no standards governing whether hospitals may grant or deny a written transfer agreement to Dr. Haskell. There are no procedures by which Dr. Haskell can appeal a hospital's denial of his request for a written transfer agreement. Furthermore, there are no procedures whereby Dr. Haskell can appeal Director Baird's denial of his waiver request. *See* Ohio Admin. Code § 3701–83–14(E) ("The refusal of the director to grant a variance or waiver ... shall be final and shall not be construed as creating any rights to a hearing under Chapter 119 of the Revised Code.").

The written transfer agreement requirement of Ohio Administrative Code section 3701–83–19(E), as applied to Dr. Haskell's Dayton Clinic, permits hospitals arbitrarily to deny Dr. Haskell the ability to operate his abortion clinic, while Director Baird's discretion to grant a waiver or variance is not appealable. In *Iheama,* the court considered the plaintiffs inability to receive a state license to operate an adult care facility due to a third party's refusal to grant plaintiffs an affiliation agreement. 115 F.Supp.2d at 868. The court ruled that the state's requirement that plaintiffs enter such an affiliation agreement with a third party denied the plaintiffs of procedural due process because the third party providers could deny the plaintiffs an affiliation agreement for arbitrary reasons and the plaintiffs had no recourse from such arbitrary decisions. *Id.* at 871–72; *see also County of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting that protection against arbitrary action is at the core of the meaning of due process); *Yick Wo v. Hopkins,* 118 U.S. 356, 366–67, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (condemning arbitrary exercises of power).

In this case, counsel for Director Baird argues that the state does not impermissibly assign the licensing function to third parties because Director Baird retains the ultimate authority to grant waivers or variances to the written transfer agreement requirement. But Dr. Haskell was not entitled to a hearing regarding his application for a waiver, and he cannot appeal Director Baird's denial of a waiver. *See Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' ") (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

Furthermore, as applied in this case, the regulation permitting Dr. Haskell to seek a waiver did not afford him a fair opportunity to seek a waiver because Director Baird failed to give his request for a waiver full and fair consideration. According

to the regulation, Director Baird may grant a waiver if the written transfer agreement requirement poses "an undue hardship" and if the "waiver will not jeopardize the health and safety of any patient." Ohio Admin. Code § 3701–18–14(D)(2). Director Baird admits that the requirement poses an undue hardship to Dr. Haskell because he is unable to obtain a written transfer agreement from any Dayton hospital. Director Baird contends that granting the waiver would jeopardize the health and safety of patients.

In fact, Director Baird failed to consider fully whether granting a waiver in this case would jeopardize the health and safety of Dr. Haskell's patients. Director Baird failed to consider the availability of Dr. Haskell's back-up obstetrics-gynecology group that had successfully provided back-up services to the Clinic for years. In fact, the ability of these back-up physicians to admit patients directly to local hospitals means that Dr. Haskell is likely able to provide superior care to his patients than a written transfer agreement would provide. Furthermore, Director Baird failed to consider fully the significance of the letter from Miami Valley that stated that although it was rescinding its written transfer agreement with Dr. Haskell, the hospital would still admit patients from the Clinic. Instead of properly considering the relevance of these available methods of ensuring the same level of care ensured by a written transfer agreement, Director Baird denied Dr. Haskell's request for a waiver principally because he failed to obtain a written transfer agreement from a local hospital. Director Baird and ODH were affected by political pressure from constituents and politicians to find a way to shut down Dr. Haskell's Dayton Clinic.

Therefore, Plaintiffs were denied procedural due process as guaranteed by the Due Process Clause of the Fourteenth Amendment when Director Baird denied Dr. Haskell's request for a waiver, failed to provide him with an opportunity for a hearing on his request, and failed to provide an opportunity to appeal the denial of the waiver.

## V. Conclusions of Law

1) Director Baird's denial of an ASF license for the Dayton Clinic, denial of a waiver of the written transfer agreement requirement for the Clinic, and order to Plaintiffs to cease operating the Clinic will cause irreparable injury to Dr. Haskell, who will lose substantial business if he must close the Clinic.

2) Director Baird's denial of an ASF license for the Dayton Clinic, denial of a waiver of the written transfer agreement requirement for the Clinic, and order to Plaintiffs to cease operating the Clinic will cause irreparable injury to women in the Dayton area who seek abortions.

3) The written transfer agreement requirement of Ohio Administrative Code section 3701–83–19(E), as applied to the Dayton Clinic, creates an undue burden and a substantial obstacle for women seeking abortions in the Dayton area.

4) The written transfer agreement requirement of Ohio Administrative Code section 3701–83–19(E), and the waiver and variance provisions of Ohio Administrative Code section 3701–83–14(D), as applied to the Dayton Clinic and Dr. Haskell's application for a waiver of the written transfer agreement requirement, violate Plaintiffs' right to procedural due process.

## VI. Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Permanent Injunction is **GRANTED.** Defendant is **PERMANENTLY ENJOINED** from enforcing the written transfer agreement requirement of Ohio Administrative Code section 3701–83–

19(E) as applied to Plaintiffs' Dayton Clinic.

**IT IS SO ORDERED.**